**THOMPSON v. GIBBES et al.**

Civ. No. 1273.

District Court, E. D. South Carolina,
Columbia Division.

May 26, 1945.

S. Morgan, of Orangeburg, S. C., Thurgood Marshall and Edward R. Dudley, both of New York City, and Arthur D. Shores, of Birmingham, Ala., for plaintiff.

Frank A. Graham and Fred D. Townsend, both of Columbia, S. C., for defendants.

WARING, District Judge.

This action is brought for the individual benefit of the plaintiff as well as class action on behalf of the negro teachers and principals in School District No. 1, in Richland County, South Carolina. The named defendants are members of the School Board of that district, except A C. Flora, who is the Superintendent of Schools. The jurisdiction of this court is invoked under Section 24(14) of the Judicial Code, 28 U.S.C.A. § 41(14), and the civil rights are claimed under 8 U.S.C.A. §§ 41, 43, based upon the constitutional rights of the plaintiff, and the class represented by him, as guaranteed by the Fourteenth Amendment of the Constitution of the United States. The prayer is for a declaratory judgment and injunction as authorized by the Judicial Code, 28 U.S.C.A. § 400.

I.

These jurisdictional questions are put in issue by the answer of the defendants. I do not think there need be any elaborate discussion of them. It is quite clear that the court has complete jurisdiction, and the matter to be decided is whether the proof as adduced supports the allegations of the complaint. The same issue has been raised in similar cases in various jurisdictions, but I deem it unnecessary to cite any long list of authorities, save only, to refer to the controlling decision in this circuit, namely, the case of Alston v. School Board of City of Norfolk, 4 Cir., 112 F.2d 992. Reference should also be had to a similar case arising in this jurisdiction wherein the court took jurisdiction and upon the evidence produced issued a decree, which was consented to by the parties. I refer to the case of Duvall v. School Board, decided by me orally from the bench, and in which later a consent decree was presented and filed granting the prayer of the complaint, but postponing the time for it to go into effect; and allowing defendants an opportunity to revise their schedule and make arrangements for equalization of pay. See Civil Number 1082, United States District Court for the Eastern District of South Carolina, Charleston Division (unreported).[1]

II.

In the case at bar the answer, before going to the merits, sets up certain legal defenses, (1) res adjudicata, by reason of the fact that the County Board of Education of Richland County has already passed upon the question, and (2) that there is no justiciable controversy, and the matter is moot because of the recent action of the General Assembly of South Carolina providing for a certification plan for teachers. Before discussing the merits, these defenses should be briefly disposed of.

---

[1] No opinion for publication.

It appears that the General Assembly of South Carolina, in 1944, in a Supplemental Appropriation Act, made provision by which any school teacher, feeling discriminated against as to the fixing of his salary, was provided with a method for filing a complaint and having the matter passed upon by the County Board of Education, with the right of appeal to the State Board of Education, and thereafter an additional appeal to the Court of Common Pleas (the findings of fact by the State Board, however, being final and conclusive), and an additional appeal from the Common Pleas Court to the Supreme Court. This procedure will be found in Act Number 519 (erroneously referred to as Act No. 689 in the answer of defendants), which act was approved March 18, 1944, and the pertinent parts of same as relating to this case appear on pages 1561 to 1565, inclusive, of the 43rd volume of the Statutes at Large of South Carolina. It appears that the plaintiff in this case did, in June 1944, file a petition with the County Board of Education for Richland County, which Board heard the matters complained of and filed a decision adverse to the plaintiff's contention. This decision is attached as an exhibit to the answer. The defendants now take the position that such decision was res adjudicata as to the plaintiff and the group represented by him, and furthermore that such petition to the County Board, with appellate review by the State Board and courts, is his exclusive remedy and that this court is, therefore, precluded from passing upon the merits. I do not agree with this contention.

The plaintiff here bases his complaint upon his rights under the Constitution of the United States and upon the civil rights granted thereunder and implemented by the statutes hereinbefore referred to. He presents a question that can be adjudicated in this court. It is a federal question, and although the State of South Carolina may have provided a manner and method of testing the question of his salary, nevertheless, that does not, and can not, deprive this court of its jurisdiction, or the plaintiff of his right to appear here. It was claimed in argument that the state statute prescribes an exclusive method, and also that when the plaintiff started to make use of that method and he received an adverse decision that he was bound to continue through the various appeals provided. If that be done he may have to go through four separate hearings and the final decision be postponed unduly and in argument that was suggested as too great a hardship. That, however, is an argument based on convenience and does not go to the right to be here adjudicated. The real matter to be considered is whether the State of South Carolina has the right or authority to set up a system of hearings and appeals which will prevent the federal court from considering such a complaint.

This court has no criticism with the methods provided by the General Assembly and if parties wish to pursue the remedies therein offered they have a right so to do. However, this court holds equally that the General Assembly of South Carolina, or any other state, can not deprive the federal courts of the jurisdiction granted them under the Constitution and laws of the United States. If this were allowed them any state could enact laws depriving parties of the right to apply to federal courts in the protection of their civil rights.

But the defendants further claim, not only was the plaintiff required to pursue the methods of remedial relief offered by the State, but that having once made application to the County Board, it was requisite that he continue on the long road to the State Board; to the Common Pleas Court (wherein he would be bound as to facts by the findings of the State Board); and thence eventually to the Supreme Court of South Carolina. I do not agree with this contention. The plaintiff has not waived the civil rights and jurisdiction granted him by federal law by reason of an adverse decision of a County Board. There is such ample authority to support this declaration that I deem it unnecessary to quote a long line of decisions. The matter is tersely and succinctly handled in an opinion by Mr. Justice Holmes in Railroad & Warehouse Commission v. Duluth St. R. Co., 273 U.S. 625, 47 S.Ct. 489, 71 L.Ed. 807. See also Mississippi Mills v. Cohn, 150 U.S. 202, 14 S. Ct. 75, 37 L.Ed. 1052; Pusey & Jones Co. v. Hanssen, 261 U.S. 491, 43 S.Ct. 454, 67 L.Ed. 763; and The Maccabees v. City of North Chicago, 7 Cir., 125 F.2d 330. The authorities cited by the defendants do not appear to me to be applicable and the defendants have failed to discern the basic difference between the right of a state to set up an exclusive method of procedure in its own boards and courts and the right

of a state to set up forms of remedies to the exclusion of federal civil rights.

The next question raised by the answer is that there is no justiciable controversy because of the fact that the General Assembly of South Carolina has now adopted a plan for certification of teachers, which is mandatory. This mandatory certification applies only to funds furnished by the state and also applies only to the appropriation for this year (1945). The provisions referred to are a part of the general appropriation bill for the fiscal year beginning July 1, 1945 (not yet published, but a certified copy of Sec. 76 of same is on file in this cause). This section reads as follows: "For the fiscal year 1945–1946, and without committal for future years, State Aid for the payment of teachers' salaries shall be distributed monthly to the various counties and school districts for payment only to teachers who hold certificates issued by the State Board of Education under its new plan for certification of old and new teachers adopted by the State Board of Education on August 4 and September 19, 1944, and as may hereafter be amended by the State Board of Education, and such State Aid shall be disbursed to teachers in accordance with the following monthly salary schedule, to wit:"

There is then inserted a table for use in arriving at the salaries allocated to the respective groups, and the act thereafter goes more fully into the manner of computing the salaries. Section 77 provides for complaint and appeal similar to the method provided in the 1944 act, supra.

Attention should first be called to the first sentence in Section 76 hereinabove quoted, which starts with the words "For the fiscal year 1945–1946, and without committal for future years". This shows that the act is a temporary one, and that the General Assembly is frankly attempting to arrive at some solution of this difficult problem and does not hesitate to say that this is experimental. We are, therefore, warned at the outset that this is merely a one-year plan and there is not only no guarantee, but an express warning that the state does not guarantee for future years to continue this plan. Therefore, we are on notice that this is not a permanent settlement of the teacher disparity trouble.

But a more potent reply to the defense is that this appropriation by the state (which is coupled with the allocation according to the plan laid out) is a part only of the teachers' salaries. In Richland County this is probably approximately half of what the teachers receive, the balance of salaries being made up from county funds. These county funds are to be disbursed within the discretion of the County Board, which can divide and allocate them in any way that it chooses. Therefore, the act does not in any way foreclose the rights raised here and the question is clearly justiciable and one to be heard by the court.

### III.

And so we pass on to a consideration of the merits. In the presentation of this case some of the evidence and much of the argument went beyond the narrow limits of the exact point in issue. Naturally, and perhaps necessarily, this will occur whenever a case of this nature is under consideration. Questions of political, economic and social rights, as they may be affected by race or color, almost invariably cover a wide field and many points are discussed and argument entered into which do not directly aid or throw any light upon the problems under discussion. The question of equality in rights and opportunities as between people of the white and negro races has been one of the great problems of the American people brought about; first by the enslavement and introduction into this country of people of alien and different race and color; and secondly by their sudden emancipation as a war measure, and theoretical immediate transition from complete slavery into complete equality. The old cliche that Rome was not built in a day, is applicable to this situation. The idea that emancipation of a race long enslaved and without political rights, without political or any other kind of education, and without training to assume citizenship, would bring about a satisfactory situation over night could be held by only a few partisan, biased, persons motivated either by idealistic abstraction or by a spirit of political revenge and self-seeking aggrandizement. The emancipation proclamation of President Lincoln did not free the slaves in a day; and the enactment of constitutional amendments shortly thereafter and adopted for the purpose of giving equal rights to all the people of this country did not bring about that ideal condition merely because they were ratified. These things have to be lived through and arrived at after generations of experience, before men will accept them, understand

them, agree with them and work for their effect and efficiency. Many years have elapsed without these constitutional amendments and the statutes passed under their authority, having their full force and effect. In fact, many doubt whether they are yet in full force and effect and point to the disparity in wages and salaries in South Carolina; the exclusion of negroes from railroad brotherhoods; and racial riots in New York's Harlem, as some of the proofs of this. This very case turns upon whether the school Board in Richland County is carrying out the purpose and intent of the Fourteenth Amendment of the Constitution of the United States.

The chairman of the School Board impressed me as having given serious and careful consideration to these backgrounds. He truthfully said that he realized that there had been certain injustices and that he had been and still was attempting to correct them. He pointed out a self-evident truth that an edict declaring that all teachers should be paid the same salaries would not be right or proper, for those who are not as well equipped (either because of their differences in native ability or in their training) should not be put in the same classification with those of superior qualities and attainments. The difficulty is, to get the proper yardstick by which to measure the stature of a teacher and to pay him accordingly. In the discussion in this case many criticisms were leveled by plaintiff's attorneys at the newly-enacted state system for examination and certification. It was stated that the system was too elaborate and would require an expert to understand it or make it workable. That argument seems to me of little value since the law by careful consideration can be clearly understood; and working out the application of it is merely a matter of study and precision and some slight mathematical knowledge; and the State will have a statistician to handle it. In the matter of certification the State Board will have before it the tables already prepared, and will receive the results of the examinations from a National Board, which we may assume is free from bias or prejudice, since such Board will have no interest in, or be informed whether the papers presented by the respective teachers are made out by white or negro persons. The State Board will then be charged merely with the matter of correctly applying the formulae to the respective persons and arriving at the rate of salaries to be paid.

Criticism has also been made of this act because it is claimed that many of the teachers may fail, or get extremely low marks, on the examinations because of the fact that they are not well prepared. This criticism is entirely beside the point. The act is supposed to be for the benefit of the pupils and not for the support of indigent, ignorant, helpless or inadequately prepared teachers. If a teacher, be he white or black, has the requisite education and has experience in teaching and is able to pass the examination and receive a high score, he will be adequately paid because he will be ranked in the higher brackets. I do not know, nor should this court be concerned with, the effect that the adoption of this new system will have upon any individual school teacher. It may be that many of them who have been several years in the public schools will fail in these tests and be relegated to the lower schedules. It may be that this method will hurt the negroes more than the whites, or vice versa. But these contingencies are not matters to be considered by this court. The question that we have to discuss is not as to whether this is a good method for the whites or a good method for the negroes and whether it is better for the teachers to stand these tests and go through the new classification, or whether it is better for them to put up with the old system. The question before this court is whether there is now, or is going to be, a form of classification of teachers and payment to them of salaries arrived at, on some basis which absolutely removes the question of race or color. As to whether the new state system will prove satisfactory is not the concern of this court today, however much all South Carolinians may be interested in, and hope for, it as the correct solution. The concern of this court is whether it is free from the tinge of race prejudice, and I find it so to be.

With all of the foregoing in mind let us now give consideration to the particular issues of this case.

## IV.

The plaintiff, by his complaint, maintains that School District No. 1, of Richland County, has, for a number of years, and still continues to fix salaries on a basis whereby the negro teachers receive a lower rate of pay than whites, and that the only

reason for this difference is racial discrimination. On the other hand, the defendants maintain that the matter of race does not enter into the situation at all, but that teachers are rated according to their experience, scholastic training and ability. The further contention is made that by reason of studies conducted independently by the Board, and by reason of legislation enacted by the General Assembly of South Carolina, there has been a partial reclassification of teachers' salaries, and the Board is about to make a complete reclassification so that there will not be any disparity or discrimination whatsoever.

The cause came on to be heard by me. The plaintiff himself testified, but the case was mainly made out by examination of members of the Board and the Superintendent who were called as witnesses by the plaintiff; by the introduction of documentary evidence consisting of excerpts from the minutes of Board meetings; and tabulations of pay for the teachers and principals of the schools, and tables showing minimum salaries for beginners. Some of these were introduced by the plaintiff and some by the defendants. The latter also put in evidence the statutes enacted by the General Assembly in 1944, and the more recent statute enacted in 1945 (both hereinbefore referred to), and they called as a witness J. B. White, an official of the Department of Education of the State of South Carolina, who is the director of the certification of teachers. Most of the important information in this case was furnished by Dr. J. Heyward Gibbes, Chairman of the Board, and by A. C. Flora, the Superintendent of Schools for Richland County, and the testimony of the witness, J. B. White, was useful in explaining the legislative acts and State Board regulations relating to certification and how they would be applied.

Without attempting to go into details it is quite clear from the testimony of the witnesses, particularly the Chairman of the Board and the Superintendent of Schools, that prior to 1941 there was a very considerable and recognized disparity in the pay of negro and white teachers in the Richland County schools. Dr. Gibbes and Mr. Flora both testified that about that time they and the other members of the Board began to give more consideration to the problem, especially in view of the decision of the Circuit Court of Appeals for the Fourth Circuit in the case of Alston v. School Board of City of Norfolk, supra, and the matter was not only discussed in the School Board meetings, but they had some discussion with and made suggestions to the State Educational Department. As a result, the schedules of salaries were revamped and many changes made and that has been progressive to date. Among other things, a minimum salary for a beginner, whether white or black, was fixed at $900 per annum, whereas formerly and prior to 1944, there was a much lower minimum standard. For instance, in the school year 1941–42 some of the negro teachers were started at a salary as low as $675; although the lowest starting salary for any white teacher for that term was $900. The schedules for starting salaries for teachers for the past four scholastic years were put in evidence (see Exhibits A, B, C and D). These show a constantly increasing rate for minimum salaries in the colored classifications. They also show an increasing classification in the white section, although the School Board points out that the percentage of raise in the white section is not as great as that in the colored section. The effect of this is to show that improvement has been made in the disparity between the teachers of the two races, and I think a fair statement of the situation is that the School Board has been trying to eliminate gradually the disparity; and has to some extent accomplished that result. However, the exhibits above referred to (and they were put in evidence by the attorneys for the Board) show a startling disparity in the white and black sections. An attempt was made to explain these differences by the statement that the white teachers generally had much longer terms of experience than the negroes. But I noticed that wherever the same amount of experience was indicated the white teacher received several hundred dollars more as a starter. In reply to my inquiries these instances were attempted to be explained by stating that the other qualifications were in favor of the white teachers and that while the tables were based generally on experience, these other qualifications were the cause of these exceptions in the tables. The explanations did not particularly appeal to me as I think the showing that each white teacher whose name appears on the starting schedules for the past four years received a higher rate of

pay than each negro teacher with the same experience, is too unusual and startling to be explained as a mere coincidence. The exhibits put in by the Board and herein discussed go strongly to prove the allegations of the complaint.

I was greatly impressed by the intelligence, ability, interest and desire, to be just and fair to all parties, evinced by the Chairman of the Board, Dr. Gibbes, and by the Superintendent, Mr. Flora. Both of these witnesses were frank. While both denied any conscious discrimination in favor of white teachers as against negro teachers, nevertheless, I gathered from both of them that they had inherited a system that undoubtedly prior to 1941 had in it a large disparity in salaries and it was evident that this resulted from racial differences. It was shown that an earnest study and consideration of the matter has been going on for a number of years. While the Superintendent expressly denied that the Board had been engaged in what might be called "shopping" for teachers, that is to say, getting them as cheaply as possible, nevertheless, a number of members of the Board suggested that they were motivated by some such idea, although not expressing it in such bald language. There was some testimony to the effect that due to economic conditions there were more negro teachers available and applying for positions than white teachers, and, therefore, there was a greater number of negro teachers available and they were willing to work for less, and in many instances the Board had to pay higher salaries to white teachers because of the smaller supply and greater demand. Yet the schedules put in by the defendants (Exhibits A, B, C and D) show an overwhelming number among the whites of longer experience in teaching than among the negroes. It would, therefore, seem that there was a dearth of experienced negro teachers and a greater supply among the white. And so the argument of supply and demand seems rather futile.

The Chairman and the Superintendent further showed that not only had the Board been attempting to alliviate the disparity, but that for the next ensuing scholastic year they have entered upon a reclassification program which will definitely eliminate any disparity. I have already referred to the recent enactment of the General Assembly of the State of South Carolina embodied in Sections 76 and 77 of the General Appropriation Act for the year 1945–1946 (a certified copy of which was marked in evidence as Exhibit F). Under this provision, commonly referred to as the Certification Plan, and the Regulations of the State Board, the State has adopted a system by which all teachers receiving state aid are to be graded and classified. By this plan the teachers are to be classified, first according to their education: they being grouped into (1) those having a Master's Degree; (2) those having partial graduate training; (3) those having full college training; (4) those having two years college training; and (5) those having less. The next test to be applied is their period of experience in the teaching profession, and in addition, each teacher is required to stand an examination which is prepared and scored by the National Educational Board. The State Board then places each teacher in the proper classification and applying his score in the examination reported by the National Board will determine his place in the table prepared under the act and that will fix the salary which he is to receive.

If the pay of teachers were to be based entirely upon this state plan it would eliminate entirely any danger of disparity or discrimination by reason of race or color. But the difficulty encountered is that the teachers in our schools are not paid solely from state funds. That portion of the salary for Richland County which comes by way of state appropriation will have to be allocated in the method prescribed by the state act and there would be no need for court action or any supervision of this matter if we knew that method would be followed. However, in the County of Richland (and I am informed in many other counties), the state money is a portion only of the total salary. The balance of the school teachers' salaries comes from county funds. These county funds are allocated in the discretion of the County Board. If the state plan is followed in the county, then the desired result may be obtained. However, if the state plan is followed only to the extent of the use of state funds and the county funds are paid according to the direction of the County Board irrespective of classification, examination, certification and other tests prescribed by the state, then we could have the same disparity that has heretofore existed.

It was testified to in this cause, and the minutes of the Board show, that School

District No. 1, of Richland County, has resolved to allocate the county funds in the same method that the state funds are to be used. If this be done, then I do not see where there can or will be a disparity in pay as affected by race or color.

I am greatly impressed by the sincerity of the members of this Board, particularly the Chairman, and equally the superintendent. If the Board intends to carry out its resolution and does carry it out, then it might seem useless to order it so to do. On the other hand, if for any reason the intention expressed and the desires of the Superintendent and Chairman are not backed up and followed by the Board, then an order requiring the Board to so act would be appropriate. Moreover, as heretofore indicated, this state act is applicable for the current year only. In other words, if the Board intends to act in accordance with the recommendations of its Superintendent and Chairman, it will do what an order of this court would require it to do. And, therefore, it will not be harmed or injured in any way by an order, provided sufficient time is given to work out this method and revision.

It was testified that the next examination for teachers will take place in September and that the probability is that the revision and reclassification of teachers will be made by December, 1945, and that the Board intends to make all such retroactive to the beginning of the scholastic year. In view of that I am of the opinion that while an order should issue directing this Board to carry out a reclassification and adjustment of salaries as between those of equal ability and experience according to the tests prescribed for state funds that nevertheless, such order should not become effective until the Board has had ample time to carry out what it says it intends to do. Mindful of the fact that these things often take more time than estimated, I have deemed it best to postpone the effective date so as to give the Board ample time within which to act. It occurs to me that it would be the exercise of proper, equitable discretion on my part to postpone such date to the spring of 1946, and I shall fix the date for the order to become effective as of April 1st in that year.

Formal Findings of Fact and Conclusions of Law and an appropriate Order carrying into effect the foregoing views, will be filed.