**SHIRER et al. v. ANDERSON et al.**
**Civ. No. 2392.**

United States District Court
E. D. South Carolina.

Argued Jan. 23, 1950.

Decided Feb. 7, 1950.

A. W. Holman, Gary Paschal and Harold R. Boulware, Columbia, S. C., for plaintiffs.

John M. Daniel, Attorney General of South Carolina, T. C. Callison, Assistant Attorney General of South Carolina, R. Hoke Robinson, Assistant Attorney General of South Carolina, and J. Means McFadden, Chester, S. C., for defendants.

Before PARKER, Chief Judge, and WARING and TIMMERMAN, District Judges.

PARKER, Chief Judge.

This is a suit instituted by a Negro school teacher of South Carolina in behalf of herself and other Negro school teachers of that state similarly situated, against the Superintendent of Education and the State Board of Education of South Carolina and Superintendents of Education of Counties and School Districts of that state. The purpose of the suit is to have the court declare void, as violative of the Constitution of the United States, the statute of South Carolina and the proceedings of the Board of Education, had pursuant thereto, under which there had been revoked the teaching certificates of plaintiff, Pearl Green Shirer, and the others in whose behalf the suit is brought, to enjoin the enforcement against them of the orders revoking their certificates and to direct that they be restored to all rights and privileges to which they were entitled prior to the revocation of the certificates. A court of three judges has been convened pursuant to statute, a hearing has been had and the case has been submitted for final decree.

While the complaint, as originally filed, charged discrimination against Negro school teachers and attempt to evade the decision in Thompson v. Gibbes, D.C., 60 F. Supp. 872, no evidence to sustain such allegation was introduced; and by stipulation filed in advance of hearing the parties agreed "that no question of discrimination in salaries is at issue in this action". The nature and purpose of the action was thus stated in that stipulation: "It is stipulated and agreed that the relief sought by declaratory judgment in this action is that the court declare that there is no valid statute in the State of South Carolina whereby and whereunder the defendants may allegedly summarily discharge plaintiffs and to declare such examinations as may have been held void insofar as the plaintiffs herein are concerned, and also declare that plaintiff and the others in like plight and represented in this action shall be restored to all rights and privileges to which they were entitled prior to the revocation of their South Carolina State Teachers Certificates."

The statute which plaintiffs attack is section 5282 of the Code of Laws of South Carolina of 1942 which prescribes the powers of the Board of Education, granting it authority, among other things, to adopt rules and regulations for the government of the free public schools of the state, to prescribe and enforce rules for the examination and certification of teachers, to grant state teachers certificates and to revoke them "for immoral or unprofessional conduct, profanity or evident unfitness for teaching." Pursuant to this statutory authority, the State Board of Education adopted an annual teacher recertification program under which National Teacher Examinations were held annually at various places in the state for the benefit of teachers and those desiring to teach. The examinations were conducted by the Educational Testing Service of Princeton, N. J.; and teachers holding certificates were permitted to take the examinations and thus obtain a reclassification, which, if higher, would result in an increase of pay. Such an examination was held in February 1949 and was taken by around 5,000 teachers, approximately 2,400 of whom were Negroes.

During the examination cheating was discovered and fraudulent "keys" were found in the possession of several Negro teachers. From these a "master fraudulent key" was compiled; and a comparison of the examination papers with this key disclosed that cheating on a wide scale had been carried on. 801 examination papers followed the fraudulent key so closely that the correspondence could not reasonably be explained on any honest basis. The Board thereupon caused the teachers who had

handed in these apparently fraudulent papers to be interviewed and 131 of them admitted the cheating. A rule to show cause why their certificates should not be revoked was issued against the others and a hearing was afforded them. A few were acquitted of the charge by the Board, but in the greater number of cases the Board found the charges sustained and revoked the certificates of the teachers found guilty of the charges.

■ The plaintiff Pearl Green Shirer was one of those whose certificates were revoked notwithstanding protestations of innocence; but the evidence before us amply sustains the action of the Board in her case. It appears that she answered the examination questions substantially as did the fraudulent key in 6 of 10 sections of the examination. Plaintiff claimed special proficiency in "General Principles and Methods of Teaching" which constituted one section of the examination. In this section there were 45 questions. The answer sheet contained 5 answers to each question, 1 correct and 4 incorrect. The teacher taking the examination was expected to select the answer he or she thought correct by checking its number with a specially provided electrographic pencil. The fraudulent key undertook to answer only the first 10 of the 45 questions in this section, 9 of which answers were correct and 1 incorrect. Plaintiff's answer sheet showed that she undertook to answer 43 of the 45 questions, omitting the last 2. In doing so she selected the answers to the first 10 questions that were given on the fraudulent key, thereby getting 9 correct and 1 incorrect in the same particular as did the fraudulent key, although there were 4 possible incorrect answers. She then undertook to answer 33 additional questions, not covered by the key, and got only 7 of them correct and 26 incorrect. The Board saw her, heard her testify, and was in position to judge of her credibility. It was not bound to accept her denial in the face of circumstances clearly pointing to her guilt.

As heretofore stated, no question as to discrimination in salaries is raised in the case; and there is no evidence of any other sort of discrimination. The proof shows that the papers were examined by a reputable testing agency and that the fraudulent nature of the papers was ascertained in an absolutely impartial manner with which race or color could have had no possible connection. No question was raised as to two thirds of the papers submitted by Negroes; and it is perfectly clear that racial discrimination and the protection of the civil rights of Negroes has nothing to do with the case. The attack upon the statute and the action taken by the Board thereunder is that the action of the Board amounts to a denial of the due process of law required by the Fourteenth Amendment. The contentions of plaintiffs in support of this position are: (1) that their case was prejudged by the show cause order issued by the Board; (2) that no appeal to the courts was provided from Board action; and (3) that the action of the Board in revoking the certificates of plaintiffs was arbitrary and unreasonable. We think that there is nothing in any of these contentions.

■ The show cause order does not prejudge the case but merely notifies the accused teacher of the charges he is required to meet. The order recites that it has been made to appear to the Board that the teacher's certificate should be revoked for immoral or unprofessional conduct in cheating on examination, and orders him to show cause at a given time and place why the certificate should not be revoked. This is the ordinary form of a show cause order, and furnishes no basis for a contention that the case has been prejudged or will not be fairly heard upon the return to the order. The contention may be dismissed as frivolous.

■ The contention that no appeal is provided from the action of the Board has as little merit. As a matter of fact, the action of the Board is subject to review by the courts through use of the writ of certiorari; and the case of one of the teachers whose certificate has been revoked has been thus reviewed by the Court of Common Pleas of Richland County in the case entitled Julia Pettiford v. South Carolina State Board of Education, which is now on appeal to the Supreme Court of the state. An able and comprehensive opinion re-

viewing the action of the Board has been filed in the cause by Judge Greneker; and there is no reason to think that the Supreme Court will not approve the procedure for review there taken, particularly in view of the fact that it refused to take original jurisdiction on direct petition to it for certiorari but in refusing to do so stated that the refusal was "without prejudice to the petitioner to go into the Court of Common Pleas and seek the same relief as here sought, or any other relief she may deem herself entitled to." Aside from this, the teacher's certificate relates only to the right to teach in the service of the state; and it cannot be a denial of due process for the state to provide for revocation of such certificate by administrative action without provision for judicial review. The idea that due process requires judicial approval of matters relating to the hiring or discharge of a public employee is one which has no foundation either in reason or authority. See Reetz v. People of State of Michigan, 188 U.S. 505, 507, 23 S.Ct. 390, 47 L.Ed. 563; Dismuke v. United States, 297 U.S. 167, 171–172, 56 S.Ct. 400, 80 L.Ed. 561; State ex rel. Williams v. Whitman, 116 Fla. 196, 150 So. 136, 156 So. 705, 95 A.L.R. 1416; 42 Am.Jur. pp. 557–559.

■ Equally lacking in substance is the contention that the action of the Board in revoking the teachers' certificates was arbitrary and unreasonable. Even if it be assumed that arbitrary and unreasonable action with respect to matters affecting the employment or discharge of public employees could furnish ground of complaint under the Fourteenth Amendment, there is nothing here to support the contention that the action of the Board was subject to this impeachment. The evidence before the Board showed that the examination was properly provided for and properly conducted. When it appeared that there was probable cause to think that there had been widespread cheating on the examination, all the papers which had been received were carefully and impartially compared with the "keys" which were known to have been fraudulently used; and only where there was such similarity as to indicate the use of a fraudulent key was any action taken. Inquiries then made of suspected teachers resulted in confessions which disclosed the existence of a widespread conspiracy to cheat. Those who were suspected but who did not admit guilt were given full opportunity to be heard and to produce evidence in answer to the charges and to be represented at the hearing by counsel of their choice. A few were successful in persuading the Board that they were not guilty. As to the others, it is absurd to say that the Board's action was not supported by the evidence or was arbitrary or unreasonable. The question involved was a pure question of fact; and, in deciding it, the Board was at liberty to consider circumstantial as well as direct evidence, and the circumstances relied on were of strong probative value. The fact that a widespread cheating conspiracy was shown to have existed, that fraudulent keys were found, and that the papers turned in by the accused teachers corresponded in so many details with the fraudulent keys,—these taken together unquestionably furnished substantial basis for the Board's action. As was well said by Judge Greneker in the Pettiford case:

"There were a number of circumstances which indicated the use or non-use of the fraudulent key, which may be summarized briefly, as follows:

"(1) The correspondence of correct answers in an examinee's paper to the correct answers contained in the fraudulent key; (2) The correspondence between incorrect answers in an examinee's paper to the incorrect answers in the fraudulent key, and particularly whether the incorrect answers corresponded in the same identical manner of answering incorrectly; (3) The correspondence between omissions in an examinee's paper and the omissions in the fraudulent key; (4) The correspondence between stopping points in the sections of an examinee's paper and stopping points in corresponding sections of the fraudulent key; and (5) Scores made by an examinee on those sections where there was no correspondence of any consequence to the fraudulent key.

\*    \*    \*    \*    \*    \*

"A careful review of the evidence in this case indicates that there was ample, and more than ample, testimony to support the finding of the State Board of Education when it held that this petitioner had used fraudulent aid and assistance, similar to that contained in the keys or aids appropriated from those actually taking the examination, when she took this examination on February 19, 1949. The comparison between her examination paper, or answer sheets, and the fraudulent key shows such striking similarity that it is almost an inescapable conclusion that this petitioner necessarily used aid similar to that of the fraudulent key when she took this examination. While it may be stated, as an abstract proposition, that almost anything is possible, the possibility of the similarity between her examination paper and this fraudulent key being accidental or coincidental is so extremely remote as to be almost infinitesimal."

Several matters were discussed on the argument which have no bearing on the constitutional question before us. Thus, it was contended that it was arbitrary on the part of the Board to allow guilty teachers who had confessed their guilt to continue teaching under temporary permits while discharging those who denied their guilt but were found guilty after hearing. It is clear, however, that this is not a matter of which those who are guilty can complain, and certainly it has no tendency to show that they have been denied due process. It is argued also that in the case of some of the accused teachers the evidence is not sufficient to justify their conviction. If this is true, they have ample remedy as individuals in the right to review the action of the Board by certiorari in the state courts; but such individual instances, if they exist, furnish no ground for a federal court to intervene and declare void the entire action of the Board relating to this cheating episode and the statute under which the examination was held and the action taken, on the ground that they are violative of due process.

For the reasons stated the relief prayed for will be denied and the complaint will be dismissed.

Dismissed.