Roland N. PATTERSON

v.

Norman P. RAMSEY et al.

Civ. No. Y–75–964.

United States District Court,
D. Maryland.

March 29, 1976.

Larry S. Gibson, Charles C. Lee, Baltimore, Md., for plaintiff.

Benjamin L. Brown, Ambrose T. Hartman, Blanche G. Wahl, Harvey L. Okun, Baltimore, Md., for defendants.

## MEMORANDUM OPINION AND ORDER

JOSEPH H. YOUNG, District Judge.

Plaintiff, Dr. Roland N. Patterson, dismissed as Superintendent of Public Instruction of Baltimore City, brings this action under 42 U.S.C. § 1983 and directly under the Fourteenth Amendment, challenging that dismissal by the defendants, the Board of School Commissioners of Baltimore City (Board) and the individual Commissioners.

## I THE FACTS

The statutory authority for the existence of the School Board and its powers are contained in the Annotated Code of Maryland, Article 77, sections 142 and 143, and in Article VII of the Baltimore City Charter (1964 revision). The specific authority to appoint a superintendent is contained in Article VII, § 58(b) of the Charter.

Appointed to his position on July 16, 1971, plaintiff began serving on October 1, 1971.

The discussions between the City and Dr. Patterson concerning the terms of his contract appear in several communications between the Baltimore City Solicitor's Office, Robert Karwacki (then Chairman of the School Board) and Dr. Patterson (through his attorneys). This correspondence appears as defendants' exhibits 4, 5 and 6. The discussions culminated in a Memorandum of Agreement executed on December 8, 1971 (defendants' exhibit 2), providing for a term of employment "of four years commencing on the 1st day of October, 1971, and ending on the 30th day of September, 1975, subject however to the provisions of Section 58(b) of Article VII of the Charter of Baltimore City." That section provides that "The Board shall have power and authority to appoint and remove at pleasure, following a hearing if requested, a Superintendent of Public Instruction . . . ."

Plaintiff had not completed his appointed term when the question of an evaluation of his services was first discussed in a letter from Dr. Beryl Williams to the Board. By letter to Norman P. Ramsey (then Chairman of the Board) dated April 14, 1975 (defendants' exhibit 11), plaintiff requested that the Board evaluate his services. A series of correspondence between plaintiff and Ramsey led to a proposal by the Board that an evaluation of plaintiff's performance take place on May 9, 1975 (plaintiff's exhibit 4). The proposal contained in a letter of April 30, 1975, indicated that the evaluation would take place in executive session, that plaintiff would be permitted to appear with counsel of his choice, and that the plaintiff would have an opportunity to comment upon the Board's evaluation before it was made final. Enclosed in the letter were the Evaluation Criteria (plaintiff's exhibit 5). On May 1, 1975, plaintiff selected Larry Gibson, Esquire, to act as his attorney for the evaluation proceedings.

Following the exchange of a series of letters setting forth the ground rules, evaluation proceedings were held by the Board in executive session, with plaintiff and his attorney present. Sessions were held on

May 9, 12, 13, 18, 20 and 21, 1975, consuming approximately 30 hours, and resulting in 700 pages of transcript (plaintiff's exhibit 103), and 146 exhibits produced by plaintiff. At the conclusion of the proceedings plaintiff expressed his appreciation for a thorough and fair hearing (see p. 678 of the evaluation transcript).

The Board prepared a proposed evaluation (plaintiff's exhibit 18) which was hand delivered to plaintiff on June 2, 1975, with a letter of transmittal (plaintiff's exhibit 17), stating that the final evaluation would be prepared on June 4, 1975, and requesting that plaintiff prepare his comments on the proposed evaluation immediately. By a letter of the same date (plaintiff's exhibit 19), plaintiff's attorney claimed insufficient time to respond to the evaluation and called the Board's attention to its promises that plaintiff would have an opportunity to respond to the initial evaluation (see plaintiff's exhibits 4 and 12). He then called a press conference and released the proposed evaluation. The Board's response to this flurry of activity was a letter (defendants' exhibit 20) from Ramsey to Gibson indicating that the purpose of forwarding the proposed evaluation was to allow plaintiff an opportunity to review it before it was made final and public. The Board concluded that publication of the proposed evaluation obviated the need of further comments from the plaintiff.

On June 4, 1975, along with the above-mentioned letter, the Board transmitted to Mr. Gibson a draft of a resolution calling for plaintiff's resignation (plaintiff's exhibit 21), and a document marked Specifications (plaintiff's exhibit 22)—the charges against plaintiff. The Board stated that the meeting to discuss the draft resolution would be held on June 9, 1975. Through acts of unknown parties (at least unknown to the Court), the Specifications became public knowledge.

In a letter of June 6, 1975 (plaintiff's exhibit 31) from Gibson to Ambrose Hartman, Deputy City Solicitor, Gibson indicated that he could not attend the June 9 meeting and, since the Board had refused to set an alternate date for the meeting, he was "forced" to advise plaintiff not to attend. The Board met on June 9, 1975, and adopted a resolution calling for plaintiff's resignation (plaintiff's exhibit 33) and the final Specifications (plaintiff's exhibit 35). These were forwarded to plaintiff by letter of June 9, 1975 (plaintiff's exhibit 32).

The resolution passed by the Board set June 20, 1975, as the date for the beginning of the dismissal hearings (if plaintiff requested such a hearing). By letter of June 14, 1975, Gibson formally requested the hearing (plaintiff's exhibit 38), reserving all rights to oppose the alleged inequities of the evaluation proceedings. On June 19, 1975, plaintiff sought and obtained an injunction from Circuit Court No. 2 of Baltimore City which postponed the beginning of the dismissal hearings. This injunction was vacated by the Maryland Court of Appeals, and the hearings were rescheduled for July 1, 1975. Immediately after the hearing convened, the Board was advised that plaintiff had applied to the Supreme Court for a stay of the proceedings. Mr. Justice Marshall, after granting a 24-hour stay, dissolved the stay order on July 1, 1975.

During this interval (June 14—July 1) plaintiff requested detailed factual data supporting the Specifications, contending they were inadequate notice of the charges against him (see plaintiff's exhibits 38, 39, 48 and 50).

The public dismissal hearings [hereinafter "hearings"] began at the War Memorial Building with approximately 325 people in attendance at each meeting. Most of the audience were vocal supporters of plaintiff, and the atmosphere at the hearings was described as tense and somewhat intimidating to the black members of the Board. Mr. Gibson and C. Curtis Lee, Esquire, represented the plaintiff, and Mr. Hartman represented the Board. Norman Ramsey, Chairman of the Board, presided through most of the hearings. Occasionally Dr. Williams presided.

The transcript of the hearings is plaintiff's exhibit 104. It contains approximate-

ly 2500 pages in 14 volumes covering 60 hours of proceedings. The hearings began with a lengthy procedural discussion between Gibson and Ramsey on the questions of (1) who had the burden of proof, and (2) whether and when opening statements would be permitted. Ramsey ruled that plaintiff would have the burden of proof and allowed Gibson to make an opening statement. (See Vol. II pp. 1–31 for this entire episode.)

Because plaintiff maintained that the Specifications were too vague to address, the Board opened the proceeding by first calling Charles L. Benton, Director of Finance for Baltimore City, to show that plaintiff had lost the confidence of other City departments. His testimony, concerning certain financial irregularities which occurred during plaintiff's administration, was objected to by plaintiff on the ground that the Specifications did not provide adequate notice of this charge. When Benton testified from certain materials, plaintiff requested copies to prepare for cross-examination. The documents were made available to plaintiff and cross-examination of Benton was postponed until July 11 to cure any lack of notice to plaintiff of his testimony. However, Gibson did not examine the materials until July 11—just prior to Benton's cross-examination.

A similar sequence occurred with respect to the testimony of Daniel L. Paul, called by the Board over plaintiff's objections. Once again, cross-examination was postponed until July 10, 1975.

The Board's next witness was Isiah White, a school principal, who testified there was low morale in the system as a result of favoritism and poor promotion policies. He also cited the existence on his payroll of a person of whom he had no knowledge.

At this point, the Board members gave their reasons for voting to terminate the plaintiff. Gibson objected to the inclusion of these statements as evidence on the ground that the Board was sitting as a judge in the case and could not, therefore, give testimony. The Board responded that the statements were given to state publicly the reasons for the vote (see Vol. II pp. 176–179). Plaintiff's later suggestion that the Board members, after speaking, should disqualify themselves as judges was also overruled. Each member spoke and was thoroughly cross-examined by Gibson. The Board's case was closed on July 3.

Plaintiff's motion to dismiss the Specifications was denied, and plaintiff then began the presentation of his case, calling approximately 40 witnesses. The thrust of the testimony of these witnesses was aimed primarily at Specification 2, suggesting that plaintiff delegated authority well, that he did not show favoritism and that staff morale was high. In general, and sometimes in glowing terms, they praised the plaintiff's administration. Plaintiff put on no testimony relevant to the financial charges, although thorough cross-examination of Benton and Paul was conducted. At several points the Board expressed impatience with the pace of plaintiff's case and inquired of his attorneys how much longer it would last. On July 5, 1975, Gibson estimated he had approximately 50 more witnesses and that he needed 60 hours hearing time (Vol. V pp. 6–7 and pp. 294–295). On July 9, Lee indicated that on the present schedule (weeknights and all day on weekends), at least two more weeks would be required (Vol. IX pp. 16–19). On the same day, the City Solicitor's Office offered to stipulate that certain named witnesses (proffered by plaintiff) would testify that plaintiff was a fine Superintendent and should continue in office.

On Thursday night, July 10, 1975, the Board announced the schedule for the hearings would be as follows:

Friday, July 11, 1975 — 5:30 p.m.–9:30 p.m.
Saturday, July 12, 1975 — 9:30 a.m.–1:00 p.m. and
2:15 p.m.–6:00 p.m.
Sunday, July 13, 1975 — 9:30 a.m.–1:00 p.m.

Plaintiff objected to this schedule, arguing that it did not permit plaintiff to finish his presentation. The objection was overruled and Gibson used the remaining time to cross-examine Benton and to call some 10 or more additional witnesses to testify to the same general matters addressed by the previous witnesses.

Plaintiff's case was terminated by the Board (pursuant to its schedule) on Sunday, July 13, 1975 (Vol. XIII pp. 128–132). The Board asked Gibson for the names of any additional witnesses he desired to call, and names of the witnesses then present and ready to testify were supplied.

During the remainder of the July 13 session, the Board produced two rebuttal witnesses; and closing arguments were held on July 14, 1975, at which time Reverend Vernon Dobson spoke with the consent of all parties. The vote on plaintiff's termination was scheduled for July 14, 1975, but it was enjoined by Circuit Court No. 2 of Baltimore City. On July 16, 1975, the Court of Appeals of Maryland vacated the injunction, and on July 17 the Board voted to terminate Dr. Patterson as Superintendent of Public Instruction (plaintiff's exhibit 105).

On that same day, plaintiff filed the instant case requesting a temporary restraining order to prevent the removal of plaintiff from his position. The temporary restraining order was denied by Judge Frank Kaufman of this Court, and on August 8, this Court, following an open hearing, denied plaintiff's request for a preliminary injunction. The case in chief was tried from March 1 to March 5, 1976.

On these facts plaintiff alleges that he was deprived of his rights to a pre-termination hearing under the Baltimore City Charter and his rights to due process and free speech under the First and Fourteenth Amendments. Before dealing with these substantive claims, the Court must address certain jurisdictional questions.

## II JURISDICTION

On November 26, 1975, this Court issued a Memorandum and Order finding that the defendant Board of School Commissioners was not a "person" for the purposes of 42 U.S.C. § 1983; that the members of the Board, in their individual capacities, were "persons"; and that the members of the Board, in their official capacities, were "persons" for purposes of injunctive relief but not for purposes of relief in money damages. The Court interpreted the complaint as relying exclusively upon 42 U.S.C. § 1983 to state a cause of action, and dismissed from the suit non-person defendants.

Plaintiff later indicated his intention was to state a cause of action directly under the Fourteenth Amendment (via 28 U.S.C. § 1331) as well as the section 1983 cause of action, and by motion of December 19, 1975, asked this Court to reconsider its prior ruling.

It is arguable that the complaint asserted a cause of action directly under the Fourteenth Amendment. However, this issue was not briefed by either of the parties, and the Court did not consider it. In view of plaintiff's current allegations, the interests of justice require that the ruling of November 26, 1975, be re-examined.

The issues raised by the plaintiff's attempt to sue the School Board directly under the Fourteenth Amendment are the following:

1. *The Fourteenth Amendment Issues:*
   (a) Does 28 U.S.C. § 1331 give this Court jurisdiction over cases brought directly under the Fourteenth Amendment?
   (b) Does the Fourteenth Amendment provide a *cause of action* for injunctive relief and/or damages?

2. *The Eleventh Amendment Issue:*
   Does the Eleventh Amendment prohibit a suit against the defendant Board as one against the State?

1. *The Fourteenth Amendment*

The Court has separated the issues of jurisdiction and cause of action (as is re-

flected above). Failure to separate these issues has often resulted in conceptual confusion by courts and commentators.

Before discussing these issues, it is best to determine what is at stake in their resolution. The Supreme Court has determined that municipalities and their agencies cannot be sued under 42 U.S.C. § 1983 for monetary or injunctive relief, since they are not "persons" within the contemplation of the statute. *Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Thus, if these entities can be sued in federal court, they must be sued directly under the Fourteenth Amendment.

■ (a)—The first issue which must be addressed is the question of this Court's jurisdiction (under section 1331) of suits filed directly under the Fourteenth Amendment. 28 U.S.C. § 1331 provides as follows:

    (a) The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, *and arises under the Constitution*, laws, or treaties of the United States. [Emphasis supplied.]

A suit directly based on the Fourteenth Amendment would seem to be the paradigm of a case "arising under" the Constitution. Furthermore, the "person" requirement of section 1983 is absent from § 1331(a). The conclusion that jurisdiction exists is supported by overwhelming authority. *Hostrop v. Board of Junior College District No. 515*, 523 F.2d 569 (7th Cir. 1975); *Gray v. Union County Intermediate Education District*, 520 F.2d 803 (9th Cir. 1975); *Calvin v. Conlisk*, 520 F.2d 1 (7th Cir. 1975); *Hanna v. Drobnick*, 514 F.2d 393 (6th Cir. 1975); *Roane v. Callisburg Independent School District*, 511 F.2d 633 (5th Cir. 1975); *Skehan v. Board of Trustees of Bloomsburg State College*, 501 F.2d 31 (3d Cir. 1974); *Traylor v. City of Amarillo*, 492 F.2d 1156 (5th Cir. 1974); *Clipper v. Takoma Park, Maryland*, Civil No. 73–295–B (D.Md. March 25, 1975); *Dahl v. City of*

*Palo Alto*, 372 F.Supp. 647 (N.D.Cal.1974); *Perzanowski v. Salvio*, 369 F.Supp. 223 (D.Conn.1974). *See also* the remand instructions in *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), and *Cox v. Stanton*, 529 F.2d 47 (4th Cir. 1975). Jurisdiction is available under 28 U.S.C. § 1331 for a suit directly under the Fourteenth Amendment.

■ (b)—The finding of a jurisdictional basis for the suit does not end the inquiry, however. The Court must determine whether the rights granted to the people by the Fourteenth Amendment provide for a cause of action directly under that amendment. The federal courts have recognized that they possess the power to grant equitable relief against municipalities for their violations of rights secured by the Fourteenth Amendment. *Griffin v. County School Board*, 377 U.S. 218, 233–234, 84 S.Ct. 1226, 1234–1235, 12 L.Ed.2d 256, 266–267 (1964); *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *School Board v. Allen*, 240 F.2d 59, 63 (4th Cir. 1956), *cert. denied*, 353 U.S. 910, 77 S.Ct. 667, 1 L.Ed.2d 664 (1957); *Clipper v. Takoma Park, Maryland*, Civil No. 73–295–B (D.Md. March 25, 1975); *Booth v. Prince George's County*, 66 F.R.D. 466 (D.Md.1975). This Court concludes, then, that as regards plaintiff's claim for injunctive relief, he has a cause of action directly under the Fourteenth Amendment against the Board.

A more difficult question is whether this amendment provides a cause of action in damages against a municipality. Plaintiff argues that *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), is authority for the proposition that a damage remedy should be implied under the Fourteenth Amendment. A strong argument for this position is that it is anomalous to assert that injunctive relief is available directly under the Fourteenth Amendment while damages are not. A further argument stems from the general principle that federal courts should imply all remedies necessary to safeguard federal rights.

If no remedy is available in damages against a municipality, a plaintiff's damage remedies (limited as they are by 42 U.S.C. § 1983) exist only against officials who may not have the resources to meet a judgment.

Several strong arguments have also been advanced against the implication of a damage remedy. It has been argued that *Bivens* is not good precedent for such a remedy here. *Bivens* involved a federal court remedy against federal officials; here the problem is an implied federal damage remedy against municipalities, counties and their agencies. Consequently, federalism, a concept properly ignored in *Bivens*, militates against the implication of a damage remedy. *See Clipper v. Takoma Park, Maryland, supra* at p. 25. Another argument is that *Bivens* is inapplicable since Congress has already spoken with regard to damage remedies against municipalities. *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), interpreted the legislative history of 42 U.S.C. § 1983 to indicate a congressional intention not to impose liability on municipalities. The courts, it is argued, should not imply a remedy which Congress considered and purposely abandoned. *See Clipper v. Takoma Park, Maryland, supra* at p. 21; *Perzanowski v. Salvio, supra* at p. 230.

The competing arguments, briefly noted above, appear strong. The question is a difficult one which this Court need not decide at this time since plaintiff has failed to prove any damage claim against the Board. For the purpose of this case it is sufficient to find that section 1331(a) gives this Court jurisdiction over claims brought directly under the Fourteenth Amendment, and that that amendment provides a direct cause of action, at least for injunctive relief.

### 2. The Eleventh Amendment

■ The Eleventh Amendment prohibits suits against a state in the courts of the United States by citizens of another state or a foreign nation. This ban has consistently been applied to a plaintiff who is a citizen of the defendant state as well. *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662, 672–73 (1974). The immunity of the state is not limited to cases in which it is a party of record, *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), but extends to agencies or instrumentalities of the state when the state is a real party in interest. *Walstad v. University of Minnesota Hospitals*, 442 F.2d 634 (8th Cir. 1971); *Harris v. Pennsylvania Turnpike Commission*, 410 F.2d 1332 (3d Cir. 1969), *cert. denied*, 396 U.S. 1005, 90 S.Ct. 558, 24 L.Ed.2d 497. It *does not* extend to counties or municipalities or the agencies thereof. *Port of Seattle v. Oregon & W. R. Co.*, 255 U.S. 56, 41 S.Ct. 237, 65 L.Ed. 500 (1921); *Chicot County Arkansas v. Sherwood*, 148 U.S. 529, 13 S.Ct. 695, 37 L.Ed. 546 (1893); *Bennett v. Gravelle*, 323 F.Supp. 203 (D.Md.1971), *aff'd*, 4 Cir., 451 F.2d 1011, *cert. dismissed*, 407 U.S. 917, 92 S.Ct. 2451, 32 L.Ed.2d 692 (1972).

■ The Eleventh Amendment issue in this case boils down to the following question: Is the Board of School Commissioners an agency of the State of Maryland or of the Mayor and City Council of Baltimore City? In determining whether an entity is an agency of the state, the cases have relied on several indices:

1. State statutes and court decisions governing the entity.
2. Its source of revenue.
3. Its autonomy from the state government.
4. Whether it has the power to sue and be sued.
5. Whether it has the power to contract.
6. Whether the state would be responsible for a judgment against the entity.

Wright, Miller and Cooper, Federal Practice and Procedure: Jurisdiction § 3524 at 88–91, and cases cited therein. On the particular question of the status of a school board or school district, the cases are hopelessly divided—no doubt because of the many varied ways in which the states have chosen to set up their educational systems. The different structures used by the different states have resulted in varying amounts of autonomy in the local districts.

The Board of School Commissioners of Baltimore City has a somewhat hybrid nature. In some respects it is directly responsible to the State Department of Education; in others it is a creature of the City of Baltimore. The structure of Article 77 of the Maryland Annotated Code (1975 Replacement Volume) provides some insight into the status of the Board. Chapter 4 of that article is entitled "County Boards of Education." The county boards (see Art. 77 §§ 34, 35, 35A, 35B, 36, 36A, 36B, 36C, 36D) are set up and closely regulated by state law as to composition, and appointment or election of members. State law also provides for close supervision of the county boards with regard to construction of school buildings (Art. 77 § 47), consolidation of schools (Art. 77 § 53) and curriculum and courses of study (Art. 77 § 55). By contrast, the school system for Baltimore City is treated very briefly in Chapter 12 of Article 77. That chapter grants plenary authority to the Mayor and City Council of Baltimore to establish a system of free schools in the City and to delegate certain of its powers to the Board. (Art. 77 § 142.) Chapter 12 also gives Baltimore City the power to levy a property tax upon real estate to defray the expenses of the school system. In summary, the structure of Article 77 reveals a plan involving close supervision of the county boards and delegation of authority to Baltimore City regarding its school system, requiring only that the Board report to the State Board of Education on the operation of the system (§ 145).

The authority delegated by the State to the Mayor and City Council of Baltimore has been exercised in Article VII, §§ 58, 59 and 60 of the Charter of Baltimore City (1964 Revision). Section 58(a) establishes the Board of School Commissioners and provides for the appointment of its members. Section 58(b) sets out the provisions for hiring and firing of personnel by the Board. Sections 58(c), (d) and (e) give the Board power to select school sites, determine specifications for school supplies and equipment and arrange for pupil transportation. All these powers are exercised subject to the control of the City, not the State. Finally, section 59 provides for the Board's budget to be submitted to the Director of Finance, an executive official of the City. The defendants admit that the power of the Board to contract, to sue and be sued and to raise its own funds is derived from the City.

It must be noted, however, that there are certain aspects of the Board's operations which are directly governed by the State. Some sections of Article 77 of the Annotated Code of Maryland define the term "county" as including Baltimore City. Thus, the Board is under direct State control in such areas as collective bargaining (§§ 160 and 160A) and retirement systems (§ 190). Furthermore, the Board receives substantial financial assistance from the State.

The final indicator of the Board's status *vel non* as a state agency is a determination of which entity (City or State) would be responsible for a judgment levied against the Board. Article 77 § 56B(b) requires all county boards and the Board of School Commissioners of Baltimore City to carry at least one hundred thousand dollars in liability insurance. Any judgment against the Board would first be satisfied out of this fund. The remainder would be satisfied against the Mayor and City Council of Baltimore, since the Charter of Baltimore City establishes the Board.

In summary, the Board is a hybrid creature. It is established by the City pursuant to power delegated by the State. It receives most of its powers from the City, but is regulated in certain limited operations by the State. It receives its funds from both the City and the State. On balance, however, the Board is an agency of the City rather than an alter ego of the State. As such, it can be sued without offense to the Eleventh Amendment.

## III  THE CITY CHARTER

In Count III of the complaint (Second Amended Complaint–A) plaintiff alleges that the hearing afforded to him was not the "hearing" contemplated in Article VII § 58(b) of the Baltimore City Charter, thus resulting in a violation of the Charter.

■ First, it must be noted that this claim falls within the Court's jurisdiction.[1] Second, it seems most logical to treat the state law claim first, since this Court's interpretation of the Charter will profoundly affect its resolution of plaintiff's constitutional claims. *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548, 560–61 (1972).

Article VII § 58(b) of the Baltimore City Charter provides in pertinent part as follows:

(b) The Board shall have the power and authority to appoint and remove *at pleasure, following a hearing*, if requested, a Superintendent of Public Instruction . . . . [emphasis supplied].

The Court construes the words "at pleasure" to mean that the Board may remove the Superintendent for any reason except an unconstitutional reason. The statute plainly omits any requirement that the removal be for good cause or any specific reason. This reading of the provision (mandated by the plain words) makes sense in light of the relationship between the Board and the Superintendent, and in light of the highly discretionary nature of the Superintendent's job. The Board is composed of nine members, serving without compensation, whose function is to broadly oversee the workings of the system and to set educational policy in the system. The Superintendent has the highly discretionary task of implementing the Board's general directions. In such a relationship, the pleasure of the superior is quite often the standard by which the employee is hired and fired.

■ Given this reading of the words "at pleasure" the Court must now determine the meaning of the term "hearing." Plaintiff suggests the word implies a complete adversarial process, an untenable position, particularly in light of other language in section 58(b). That section includes entirely different language with respect to removal of lower level officials:

Any principal, teacher or other professional employee, below the rank of Assistant Superintendent, may be removed . . . by the Board *only after charges preferred* by *the Superintendent and trial, if requested, had by the Board.* [Emphasis supplied.]

A comparison of this language with the language relating to the Superintendent's removal clearly indicates a more formal procedure is contemplated for lower level officials than for the Superintendent. They are entitled to "charges preferred" and a "trial." He is entitled only to a "hearing," not a full adversary process.

The Charter plainly contemplates that the Board must first make a tentative decision to remove the Superintendent. The Superintendent may then request a hearing to present reasons why be should not be removed. Plaintiff improperly suggests that this reading of the word "hearing" renders the proceeding a meaningless gesture. The hearing contemplated by the Charter should have several purposes. It provides the Superintendent with the reasons for his dismissal, allows him to attempt to persuade the Board that it is in error, prevents the Superintendent from being fired for an illegal reason and perhaps informs the public as to why a change is sought in their children's education.

1. The defendants suggested rather late in the proceeding (on the eve of trial) that the Court should abstain from deciding this question while adjudicating the other claims. The defendants might have had a good argument for *Pullman*-type abstention, since there was some small possibility that a definitive state court construction of the Charter might remove the need for determining the plaintiff's constitutional claims. However, the timing of defendants' suggestion precludes a serious consideration of it. The waste of judicial resources which would be caused by abstaining in the entire case would be overwhelming since this Court has already heard and adjudicated the remaining claims of the plaintiff.

The Court did not certify the state law question to the Court of Appeals of Maryland pursuant to § 12–601 of the Courts and Judicial Proceeding Article of the Maryland Annotated Code, since that question appears straightforward; and the certification process would cause considerable delay in the resolution of this matter.

Given this reading of the word "hearing," it is clear that the plaintiff has no valid state law claim. He was afforded a public hearing before the Board. It lasted 60 hours and was conducted over the space of eleven days. He was zealously represented by two attorneys of his own choosing and through them questioned the Board members, put on his own witnesses and cross-examined the Board's witnesses. This proceeding not only meets, but far exceeds, the statutory requirement of a "hearing."

## IV  THE DUE PROCESS CLAIMS

In Counts I and II of the Complaint, plaintiff alleges that he was deprived of liberty and property without due process of law. These claims require the determination of a threshold question—was plaintiff deprived of a liberty or property interest?

1. *Deprivation of Property*

The leading cases on the question of property rights in public employment are *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In *Roth*, the Court indicated the criteria and likely sources of a property interest:

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . .

Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 561. On the strength of this rule, the Court held that a non-tenured teacher whose contract was not renewed had not been deprived of a property interest. In the companion case of *Perry, supra,*

the Court made it clear that a property interest can arise from oral or implied understandings as well as explicit written contracts or laws:

A written contract with an explicit tenure provision clearly is evidence of a formal understanding that supports a teacher's claim of entitlement to continued employment unless sufficient "cause" is shown. Yet absence of such an explicit contractual provision may not always foreclose the possibility that a teacher has a "property" interest in reemployment. . . .

A teacher, like the respondent, who has held his position for a number of years, might be able to show from the circumstances of this service—and from other relevant facts—that he has a legitimate claim of entitlement to job tenure.

*Perry, supra,* 408 U.S. at 601 and 602, 92 S.Ct. at 2699, 33 L.Ed.2d at 580. The sort of informal understandings contemplated in *Perry* have been termed *de facto* tenure. An employee has been held to have a property interest in his job if he has "tenure or the equivalent of tenure." *Satterfield v. Edenton-Chowan Board of Education,* 530 F.2d 567 (4th Cir. 1975); *Williams v. Hyde County Board of Education,* 490 F.2d 1231, 1233 (4th Cir. 1974); *Kota v. Little,* 473 F.2d 1, 3 (4th Cir. 1973); *Johnson v. Fraley,* 470 F.2d 179, 181 (4th Cir. 1972).

Using these standards to measure plaintiff's claim to a property interest, it is clear that plaintiff had no *de jure* property interest in the remainder of his "term" or in remaining Superintendent beyond his term. The City Charter indicates that the Superintendent can be discharged by the Board "at pleasure following a hearing if requested." The rule is clear that a public employee who serves at the pleasure of a government or official does not possess a property right in his job. *Brown v. Hirst,* 443 F.2d 899 (4th Cir. 1971); *Hodgin v. Noland,* 435 F.2d 859 (4th Cir. 1970); *Hirsh v. Green,* 368 F.Supp. 1061 (D.Md.1973).

The language of the Charter has been interpreted in *Wysocki v. Board of School Commissioners* (Superior Court of Balti-

more City, 1971) (defendants' exhibit No. 3) to mean that any *binding* contract between the Board and a Superintendent is illegal.

The City Charter provides that the Board shall have the power and authority to remove *at pleasure* the Superintendent. This is absolute and cannot be bargained away or limited by contract. This provision of the Charter is written into all contracts. *Wysocki, supra.* The negotiations between the parties (see defendants' exhibits 4, 5 and 6) indicate that they were aware of these limitations. Finally, the provisions of the Memorandum of Agreement (defendants' exhibit No. 2) make the agreement expressly subject to the Charter provisions.

The Charter provisions, the Memorandum of Agreement and the constructions of the Charter thus make it clear that plaintiff does not have a legitimate claim of entitlement to the rest of his "term."[2] *A fortiori,* he could not have such a claim of entitlement to services beyond the term. It is clear, then, that plaintiff did not have *de jure* tenure in his job.

Plaintiff alleged in his complaint that the Baltimore City School System had for fifty years maintained a *de facto* tenure system regarding Superintendents. However, no evidence was offered to prove the existence of this system other than a stipulation as to the terms of office of all the Superintendents since 1915. This meager bit of evidence is insufficient to justify the conclusion that there were informal, oral understandings that justified plaintiff's expectation of continued employment as Superintendent. Plaintiff's argument for *de facto* tenure must also fail.

At oral argument, plaintiff advanced one additional contention that he was deprived of a property interest. The Charter, he argued, guaranteed him the right to serve until removed following a hearing. The Charter does contain this guarantee and it can be argued that plaintiff had a property interest, *i. e.,* a legitimate claim of entitlement, in not being removed before being afforded the hearing required by section 58(b) of the Charter. However, as noted herein, it is clear that plaintiff was afforded a hearing satisfying the requirements of section 58(b). Thus, plaintiff was not deprived of that interest.

### 2. *Deprivation of Liberty*

In Count I of his complaint, plaintiff alleges that the reasons given by the Board for terminating him deprived him of a liberty interest. He cites the allegations contained in the Board's Specifications (plaintiff's exhibits 22 and 35 are two substantially identical versions of this document), the statements by the Board members at the hearing and the testimony of the Board witnesses at the hearing. The Specifications charge basically that:

(a) Plaintiff failed to maintain adequate working relations with the Board because he could not accept criticism and direction, he interposed serious obstacles in the path of direct communication between lower level staff and the Board, and he refused to negotiate a proper contract of employment for himself.

(b) Plaintiff created conditions inimical to the best interests of public education as a result of his personnel practices; he failed to delegate authority, failed to recruit the best personnel, and exhibited favoritism among personnel resulting in a decline of staff morale.

(c) The Board and other city agencies had developed serious doubts about the plaintiff's "credibility."

With regard to these Specifications, plaintiff testified as an expert qualified in the area of job qualifications for high level administrators in the field of education. His testimony was that the charges outlined above were quite serious and would preclude re-employment.

In addition to the Specifications, plaintiff also points to the charges that were made

---

2. Plaintiff's claim of denial of a property interest in the remainder of his term is further weakened by the fact that plaintiff, while terminated before the end of his term, was paid his salary for the rest of the term.

at the hearing. Plaintiff has itemized these, and they total over 60 in number, grouped in several categories. Generally, the charges made at the hearing fit under the Specifications, but they may also be grouped as follows:

(i) Charges which concerned poor personnel policies. These included failure to delegate authority, favoritism, failure to fill crucial positions, fostering of poor discipline, and failure to settle labor disputes.

(ii) Charges which concerned inability to get along with the Board. These included verbal assaults on Board members, refusal to meet with Board members, bypassing the Board's authority, restricting staff communication with the Board, and public criticism of the Board and the City Administration.

(iii) Charges relating to lack of honesty or candor. These included making inaccurate statements on which the Board relied, withholding information from the Board, misrepresenting facts to the Board, falsification of Board minutes, and failure to order complete cooperation with a pending criminal investigation.

(iv) Charges which relate to failure to cooperate with other city agencies, particularly the Department of Finance. These included late submissions of budgets, designating clerks as substitute teachers, payment of employees who had not worked, late payment of employees who had worked, failure to implement financial reform measures (suggested by an independent consultant), keeping phantom employees on the payroll, and bad inventory control.

On these facts, the Court must determine if plaintiff (as a result of these charges) was deprived of a liberty interest. The leading case concerning the existence and deprivation of liberty interests is *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), where the Court indicated that an employee may be deprived of a liberty interest if he is fired for reasons which deprive him of his reputation or standing in the community, or which stigmatize him in such a way that he cannot obtain other employment in his chosen field of work. In articulating this rule, the courts have made it clear that charges, while not deeply damaging to character, may nevertheless preclude future employability and thus deprive the employee of a liberty interest. In *Kota v. Little,* 473 F.2d 1 (4th Cir. 1973), for example, the court, quoting with approval Judge Boreman's concurrence in *Johnson v. Fraley,* 470 F.2d 179, 185 (4th Cir. 1972), said:

"To sufficiently state a constitutional claim of denial of 'liberty,' a nontenured teacher whose contract has not been renewed must plead *either* that his 'good name, reputation, honor or integrity' has been damaged by, in addition to the nonrenewal, the assignment of reasons for the nonrenewal, *or* he must plead that the State has imposed on him some 'stigma' or 'other disability,' in addition to the nonrenewal, which foreclosed his freedom to take advantage of other employment opportunities." [Emphasis supplied.]

*See also McNeill v. Butz,* 480 F.2d 314, 319 (4th Cir. 1973).

Courts typically have had little trouble with the notion of a "reputational" liberty interest. There the requirements have been quite strict; allegations of public drunkenness, legal incompetence, dishonesty or fraud have been required. In the second class of cases, those in which only the "employability" liberty interest is threatened, the courts have been more troubled. Several cases have recognized that *any* firing damages future employability and yet have indicated that a firing by itself is not sufficient to jeopardize a liberty interest. *Vance v. Chester County Board of School Trustees,* 504 F.2d 820 (4th Cir. 1974); *Kota v. Little, supra.* Other cases have indicated that a firing for general dissatisfaction with job performance is not sufficient to result in a liberty deprivation even though it could make future employment harder to come by. In *Russell v. Hodges,* 470 F.2d 212, 217 (2nd Cir. 1972), Chief Judge Friendly said:

Indeed, a general rule that informing an employee of job-related reasons for termination created a right to a hearing, in circumstances where there was no constitutional requirement for the state to do anything, would be self-defeating; the state would merely opt to give no reasons and the employee would lose the benefits of knowing what might profit him in the future.

*See also LaBorde v. Franklin Parish School Board*, 510 F.2d 590 (5th Cir. 1975); *Springston v. King*, 399 F.Supp. 985 (W.D.Va. 1975); *Calo v. Paine*, 385 F.Supp. 1198 (D.Conn.1974) (suggesting that only those defects which are beyond the power of the employee to change are stigmatizing).

The facts of this case require no nice distinctions regarding the employability liberty interest. Several of the charges go directly to plaintiff's honesty—financial and otherwise. They clearly jeopardize his reputation and standing in the community. (See paragraphs (c), (iii) and (iv) above.) Many of the other charges, it is true, do not damage plaintiff's general reputation and standing; therefore they go only toward his employability interest. Nevertheless, they do not pose close cases. They charge him with serious mismanagement of personnel and finances, and a rather serious inability to work under, and be directed by, the Board—his direct superior.

The defendants suggest that they are not responsible for the publicity of the charges and so are not responsible for depriving plaintiff of his liberty interests. *LaBorde v. Franklin Parish School Board*, 510 F.2d 590, 593 (5th Cir. 1975); *Springston v. King*, 399 F.Supp. 985, 988 (1975). This argument suggests a salutary maxim except that it places a discharged employee in a difficult position. If he wishes to be heard in his defense, he takes the chance that any damage to his reputation adduced at the hearing will be chargeable to him and not to his employer.

In the instant case, it is uncontroverted that plaintiff was responsible for the publication of the evaluation report, but that he did not publish the Specifications. (Indeed, the record contains no evidence as to who published the Specifications.) Furthermore, it is uncontroverted that plaintiff requested a public hearing (he had a choice of a public or private hearing), and made quite sure that it was as public as possible. The transcript of the hearing reveals several instances where plaintiff's counsel insisted that additional people be allowed into the hearing room. Although the public nature of the hearing was clearly plaintiff's responsibility, it cannot be stated that the plaintiff, by attempting to publicly clear his name, has thereby accepted full responsibility for any additional smirch that occurred at the public hearing. Such a rule, generally applied, would inhibit a discharged employee from seeking publicly to clear his name, even though public charges had already been lodged against him.

There is no clearly accepted rule to govern this issue; the policy considerations are closely balanced, and the facts of this case are also equivocal. Even if it were to be assumed that plaintiff's deprivation of his liberty interest resulted from the Specifications and testimony at the hearing, plaintiff cannot prevail since he received all the process which was due him.

3. *Due Process*

■ In determining whether a person has been afforded due process, it is often helpful (before investigating the individual "elements" of due process) to reformulate the general question as follows: was plaintiff afforded all the process that was due him in light of all the facts and circumstances of his case? This reformulation is helpful since the hallmark of due process is its flexibility. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1236 (1961); *Simard v. Board of Education*, 473 F.2d 988 (2nd Cir. 1973). However, courts have attempted to formulate certain general categories or criteria (often called "ingredients of due process") against which

the fairness of a particular procedure can be judged. Typically these have included:

 (a) Notice and specification of the charges.

 (b) Opportunity to be heard.

 (c) Opportunity to confront accusers.

 (d) An impartial tribunal.

*Satterfield v. Edenton-Chowan Board of Education*, 530 F.2d 567 (4th Cir. 1975); *Vance v. Chester County Board of School Trustees*, 504 F.2d 820 (4th Cir. 1974); *Grimes v. Nottoway County School Board*, 462 F.2d 650, 653 (4th Cir. 1972). While listing these elements, the same opinions have been careful to note that the content of these elements may differ widely in light of the parties, the subject matter and the circumstances involved. *Vance, supra* at 824; *Grimes, supra* at 653; *Ferguson v. Thomas*, 430 F.2d 852, 856 (5th Cir. 1970). Indeed, in certain situations, some of the ingredients disappear altogether. In *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), for example, there is no mention of an impartial tribunal or the right to confront accusers.

In assessing those elements of due process applicable to the instant case, and the content of each element, it must be kept in mind that plaintiff has not proved a deprivation of property. Rather, his proof establishes at most a deprivation of liberty. The purpose of a hearing in such cases is to afford the discharged employee an opportunity to clear his name and reputation, and to remove any stigma which might affect his future employability. *Arnett v. Kennedy*, 416 U.S. 134, 157, 94 S.Ct. 1633, 1645–46, 40 L.Ed.2d 15, 35 (1974); *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548, 558–59 (1972).

(a) *Notice and Specification of the Charges*

It is undisputed that the courts have considered notice to be one of the crucial elements of due process. The question, then, is how much notice is sufficient. The general rule is that a person who is to be affected by administrative action must be given notice sufficient to apprise him of the proposed government actions so that he may oppose it if he desires. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Furthermore, one to be affected by administrative action must be apprised of the charges against him in such specifics and at such a time as to permit meaningful preparation of a response. *In Re Ruffalo*, 390 U.S. 544, 550, 88 S.Ct. 1222, 1225–26, 20 L.Ed.2d 117, 121–22 (1968); *In Re Gault*, 387 U.S. 1, 33, 87 S.Ct. 1428, 1446, 18 L.Ed.2d 527, 549 (1967).

Obviously, each case must be decided on its own peculiar facts with certain general guidelines to follow. It is clear, for example, that notice which occurs on the day of the hearing is rarely adequate. *See, e. g., In Re Gault, supra; Holland v. Oliver*, 350 F.Supp. 485 (E.D.Va.1972). Excessively general charges are also typically insufficient. (In *Gault*, for example, a general charge of "delinquency" was found to be constitutionally infirm.)

A diversity of opinion on the requirements of adequate notice can be found in public employment cases. In *Wagner v. Little Rock School District*, 373 F.Supp. 876, 883 (E.D.Ark.), the court said:

 In most cases due process notice contemplates accusations of specific acts or patterns of conduct unequivocally identified rather than general charges relating to attitudes and behavior patterns unsupported by specific factual allegations.

Other cases have held that an employee need not be informed of each piece of evidence to be adduced against him. Rather, general allegations about patterns of conduct are sufficient. *Robison v. Wichita Falls and North Texas Community Action Corporation*, 507 F.2d 245 (5th Cir. 1975); *English v. North East Board of Education*, 385 F.Supp. 1174 (W.D.Pa.1974); *Karstetter v. Evans*, 350 F.Supp. 209, 211 (N.D.Tex. 1971).

Plaintiff testified that the Specifications (plaintiff's exhibit 35) were excessively general and that he did not have the slightest idea of the conduct referred to or how to meet the charges. This testimony is not credible in light of what had preceded the

Specifications. Prior to receiving the Specifications, plaintiff had spent over 30 hours in evaluation sessions with the Board. Eventually the Board issued a report of its evaluation (plaintiff's exhibit 18) containing ratings of plaintiff's performance in various areas. An examination of the Evaluation Report and the Specifications shows the following correlations:

| Specification No. | Evaluation No. | Subject Matter |
|---|---|---|
| 1. (A) | I. (B) | Inability to accept criticism |
| 1. (B) | I. (B) | Inability to maintain harmonious relations with the Board |
| 2. (A) | III. (D) | Decline in staff morale |
| 2. (B) | III. (D) | Favoritism among staff |
| 2. (C) | III. (D) | Inability to delegate authority |
| 2. (D) | III. (D) | Failure to recruit and assign best personnel |
| | III. (C) | Poor personnel policies |
| | I. (C) | Employment and promotions of personnel |
| 2. (generally) | III. (C) | Personnel policies |
| 3. | Summary E | Credibility |

With regard to each of the evaluation sections listed, plaintiff received a rating of below adequate. Having sat through the evaluation proceeding (which was conducted according to the order of the Evaluation Criteria—plaintiff's exhibit 5), it should have been a relatively straightforward task for plaintiff to examine the below-adequate ratings and consult his notes or transcriptions of the evaluation proceedings to determine exactly which incidents the Board was relying on to support the Specifications. It should be noted also that plaintiff had both the Specifications and the Evaluation Report by June 4, 1975, nearly a month before the hearing commenced.

Plaintiff testified that as to each of the over sixty charges made by the Board members at the hearing, he had no notice. He also indicated that, with proper notice, he could have refuted the charges by the testimony of witnesses, the production of documents and his own explanations.

Once again, this testimony is not credible. A careful examination of the transcript of the evaluation proceedings indicates the great majority of the charges made at the hearing were also areas of concern at the evaluation sessions. Plaintiff admits that many of the same areas were discussed, but suggests that the tone of the evaluation proceedings was not accusatorial, and that he believed that the Board members' concerns had been laid to rest. The "below adequate" ratings in the relevant areas of the Evaluation Report and the Specifications should have been sufficient to disabuse plaintiff of these impressions and certainly put him on notice of the Board's concerns.

Some of the charges made at the hearings were not presaged by any discussions at the evaluation sessions. Foremost among these are certain allegations with respect to plaintiff's personal integrity and demeanor (supplying the Board with incorrect information, making misrepresentations to the Board, derogatory speeches about the Board and City Hall, denying audiences to Board members). Plaintiff's concern is not supported by the evidence. First, several of the charges could come under the general notion of lack of credibility (Specification No. 3). More importantly, these were instances about which plaintiff had direct and personal knowledge. He could have investigated them after the charges were made (the Board's case terminated on July 3, 1975; and his case lasted until July 13, 1975) and responded to them with his own testimony. Neither complicated research, nor production of files, nor testimony of witnesses was required; nevertheless plaintiff did not choose to testify.

Plaintiff's most serious complaint is that he was surprised at the hearings with complaints from the Board members but chiefly from Board witnesses regarding slovenly and perhaps even dishonest financial management. It is clear that this testimony was not offered for the purpose of showing plaintiff's financial ineptitude. Rather, it was offered to show (pursuant to Specification No. 3) that plaintiff had lost the confidence of the Department of Finance—a city agency with which plaintiff was required to

work closely. As such, Specification No. 3 and the numerous references to difficulties with the Finance Department contained in the evaluation proceedings should have provided some notice to plaintiff. However, plaintiff claims that the Evaluation Report constituted misleading notice since he was rated adequate in financial areas.

Plaintiff's claim of surprise as a result of the testimony as to financial irregularities deserves some comment, but it cannot bring success to plaintiff's claim inasmuch as the Board permitted plaintiff's counsel to delay his cross-examination of these witnesses. The witnesses testified on July 2, 1975, and were not cross-examined until July 10, 11 and 12, 1975. Furthermore, important documentary evidence (Benton's report) was available to plaintiff's attorney during that time period. By July 10, plaintiff had complete notice of the financial testimony and should have been able to respond to it. Plaintiff argues that this notice, while complete, was untimely and relies on the "same day" notice cases such as *In Re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), and *Holland v. Oliver*, 350 F.Supp. 485 (E.D. Va.1972), suggesting that these cases stand for the proposition that notice given once a proceeding has begun is not timely. The cases do not support plaintiff's position. They dealt with notice given on the same day as a one day hearing. The hearing in the instant case spanned two weeks; thus giving plaintiff adequate time to prepare a response.

One final observation should be made with respect to the financial testimony. It did not deal with obscure matters with which plaintiff and his attorney were unfamiliar. Rather, it dealt with major matters of which plaintiff admittedly had prior personal knowledge. Also, plaintiff's attorney no doubt knew of most of these matters from his prior service on the School Board throughout much of the time in question. This observation points out that plaintiff, as a top level school administrator, and his attorney, as a lawyer and former member of the Board, were in an ideal position to permit rapid retrieval and presentation of any evidence relevant to the charges. The ten-day period which they had was sufficient.

As a result of the Specifications, the Evaluation Report and sessions, and the delayed cross-examination permitted by the Board, plaintiff had sufficient, timely and specific notice of all the charges in order to formulate a meaningful reply.

### (b) *Opportunity to be Heard*

Along with notice, the opportunity to be heard is the fundamental bulwark of due process. When all other procedural safeguards are weeded out because of pressing government interests, these two remain. The basic rule regarding opportunity to be heard is that it be presented at "a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66 (1965); *Grannis v. Ordean*, 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363 (1914). What amounts to a "meaningful" opportunity to be heard must depend on the competing interest involved, and all the facts and circumstances of each individual case. *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230, 1236 (1961); *Vance v. Chester County Board of School Trustees*, 504 F.2d 820, 824 (4th Cir. 1974); *Grimes v. Nottoway County School Board*, 462 F.2d 650, 653 (4th Cir. 1972); *Schoonfield v. Mayor and City Council of Baltimore*, 399 F.Supp. 1068 (D.Md.1975).

Two preliminary points should be made before considering the evidence. First, the timeliness of the hearing is not in question here. In many cases (*see e. g., Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Huntley v. North Carolina*, 493 F.2d 1016 (4th Cir. 1974)) the issue is whether a hearing must be provided before or after the deprivation. That issue does not arise here since the plaintiff was not terminated until after his hearing. Second it should be noted that the only plausible claim that plaintiff has to due process is a denial of a

liberty interest. In such cases the courts have held that the purpose of the hearing is to allow the discharged employee an opportunity to clear his name.

The most striking piece of evidence in the case is a 2500-page transcript of the hearings. These proceedings lasted 60 hours and were spread out over a two-week period. Plaintiff called 40 witnesses, and his counsel carefully cross-examined the Board members and the Board's witnesses. The Plaintiff has not cited, nor has research disclosed, a case where such an extensive hearing was held to be an inadequate opportunity to defend a discharged employee's liberty interest.

One of the plaintiff's arguments is that the Board supplied him with insufficient notice of the charges made at the hearing, thus depriving him of an adequate opportunity to be heard. Plaintiff is correct in noting that there is a close relationship between notice and opportunity to be heard. Having commented on this relationship on the issue of notice, the general question need not be dealt with again.

One specific item, however, must be addressed. At trial, plaintiff indicated that he and his attorneys had formulated a strategy for meeting the Specifications. The strategy was to call witnesses from a cross section of the school community in order to rebut the Specifications. Plaintiff suggests that the charges made at the hearing caused severe modifications in the strategy and thereby significantly diminished the actual time plaintiff had to present his case. This argument is really another view of the notice claim. The due process clause guarantees that all the charges which affect an employee's liberty interest be made known to him in adequate time to prepare a response. It does not guarantee a blueprint of the evidence since testimony of individuals cannot be anticipated completely. It appears that plaintiff's difficulties stemmed in large part from a stubborn adherence to his pre-hearing strategy and a fervent desire to try the case in public rather than reap the benefits of a due process hearing. He presented witness after witness who testified to the high morale in the school system, the lack of favoritism, the proper delegation of authority and the general excellence of plaintiff's administration, but presented no witnesses regarding the financial matters which he argues were most damaging to his liberty interests, nor did the plaintiff attempt to refute those charges by his own testimony.

Plaintiff also argues that he was denied an opportunity to be heard because of the abrupt termination of the hearings. It should be noted from the facts recited herein that the Board's case was presented on July 2 and 3, 1975. Plaintiff's case lasted the remainder of the hearing, with a small amount of time for rebuttal. On several occasions, the Board President made inquiry as to the anticipated hearing time and witnesses still to be called. On each occasion plaintiff's counsel gave the information requested. One estimate was 60 hours and 50 more witnesses, another was two more weeks hearing time. Subsequently, on July 10, 1975, the President announced that plaintiff's case would terminate on July 13, 1975, leaving plaintiff 15 more hours of hearing time.

A review of the transcript gives a clear impression that the Board was becoming impatient with the pace of plaintiff's presentation. The termination announcement could not have come as a complete shock; in fact it was inevitable. Before closing plaintiff's case on July 13, 1975, the President asked plaintiff's attorney for a list of additional witnesses that plaintiff wanted to call. Counsel responded only with a list of witnesses who were then present and ready to testify.

Plaintiff testified at trial that there were several matters on which he had more evidence to produce, indicating, with regard to each of these, which witnesses, including himself, would be called to testify. He further indicated that the preparation of his case on each of these matters was in varying stages of completion at the time of the termination of the hearings. Each the defendants testified that plaintif not request an opportunity to test

each indicated he would have extended the announced schedule for plaintiff's case to enable him to testify.

On these facts, plaintiff argues that the termination of his case deprived him of a meaningful opportunity to be heard. Nothing could be further from reality. After the announcement of a termination date, plaintiff's case proceeded with the same sort of cumulative and in some cases scurrilous testimony that had been marshalled before. He claims that some of the most important charges by the Board and its witnesses concerned financial improprieties, yet he did not use the remaining time (with the exception of the cross-examination of two of the Board's key financial witnesses) to refute the charges.

Thus, the termination of the plaintiff's case did not deprive him of the constitutional requisites. If he failed to meet any of the charges through his own witnesses and the lengthy cross-examination of the Board's witnesses, the failure was due to his faulty strategy—not the Board's malfeasance.

The plaintiff's final argument with respect to his opportunity to be heard concerns the question of burden of proof. He argues that throughout the hearings, the burden of persuasion was placed upon him. For this conclusion he cites a colloquy between counsel and the President (Vol. II pp. 14, et seq.) and the final Resolution removing him (plaintiff's exhibit 105).

Plaintiff's argument relies on the case of *Huntley v. North Carolina State Board of Education,* 493 F.2d 1016 (4th Cir. 1974). That case held that the State deprived the plaintiff of due process when it revoked her teaching certificate (for fraud in obtaining it) and terminated her employment in an *ex parte* proceeding. In a subsequent post-termination hearing the employee was given notice "reasonably calculated to indicate to Mrs. Huntley and her attorney that her fraud had already been lawfully established, that the [first] *ex parte* invalidation was proper, and that all [that now] was being offered was an opportunity to prove that the earlier administrative action was

unjustified." *Huntley* at p. 1019. It was the assumption by the Board that Mrs. Huntley's guilt was already proven that the court found offensive. It distinguished the case of *Shirer v. Anderson,* 88 F.Supp. 858 (E.D.S.C.1950):

Thus, if the show cause notice in this case had outlined the charges against Mrs. Huntley and notified her to show cause why her certificate should not be revoked, as did the show cause order in *Shirer,* the case would present no problem.

*Id.* The *Huntley* court also based its decision on the fact that the notice was based on the prior unconstitutional *ex parte* proceeding, *i. e.,* that proceeding was assumed valid, and Mrs. Huntley was offered only an opportunity to challenge what purported to be a valid legal conclusion. The instant case is much more like *Shirer.* Plaintiff was given the Specifications and the preliminary Board Resolution to remove him. The hearing, rather than placing on him the burden of disproving charges already deemed to be legally established, gave him the opportunity (mandated by the "liberty" cases) to rebut the charges against him. The Court is satisfied that the plaintiff was not denied a meaningful opportunity to be heard because of the allocation of the burden of persuasion.

(c) *The Right of Confrontation*

The Fourth Circuit has given specific guidance on the extent of this right in a case involving termination of public employment. *McNeill v. Butz,* 480 F.2d 314 (4th Cir. 1973), and *Satterfield v. Edenton-Chowan Board of Education,* 530 F.2d 567 (4th Cir. 1975). In *McNeill, supra,* one of the plaintiffs was deprived of her job as a result of evidence she could not respond to. The evidence against her consisted solely of the testimony of nameless informants whom she was not allowed to cross-examine and investigative reports of which she was furnished only excerpts. *Satterfield v. Edenton-Chowan Board of Education, supra,* indicates the other end of the continuum. *Satterfield* held that a school employee was not deprived of due process

when a very small part of the evidence against him consisted of reports of complaints received by school officials. Since the real evidence against the employee consisted of direct testimony based on the actual knowledge of witnesses and superiors, there was no violation of the right to confrontation.

The right to confrontation is not denied when very minor parts of the evidence against an individual come from anonymous sources while the major reasons for the dismissal consist of direct testimony and documentary evidence. Plaintiff in this case can point to six minor instances of reliance on un-confrontable sources of information. In two of these the Board members in question did not rely on unnamed informants, but simply stated conclusions or opinions about the plaintiff's administration. They then refused to give the specific reasons or sources of information on which they based their opinions. (See Vol. III p. 162 and Vol. II p. 304.) In the remaining cases, Board members refused to name individuals about whom they were speaking or from whom they received information. (See Vol. II pp. 206–210, Vol. II pp. 211–214, Vol. II pp. 280–283, Vol. III p. 111.) In each of these cases there were important reasons for confidentiality since the unnamed individuals were still part of the school system.

In any event, these instances are a minute part of the Board's case against plaintiff. It is interesting to note each comment was elicited on cross-examination, thus negating the inference of a desire on the part of Board members to charge plaintiff with specific conduct and then refuse to permit him to confront the source of the accusation. Most importantly, they seem clearly to come under the *Satterfield de minimus* rule. The vast majority of the evidence on which the Board relied was real documentary and testimonial evidence to which the plaintiff had complete access. The main reasons for plaintiff's termination were his inability to work effectively with the Board and the Board's lack of confidence in him as a candid administrator. From the testimo-

ny at trial and a review of the hearing transcript, it is obvious that the Board's reliance on confidential sources did not play a significant part in its decision to terminate plaintiff.

Finally, the reliance by the Board in these few instances on hearsay evidence did not jeopardize plaintiff's opportunity to defend his liberty interests. The charges faced by plaintiff were such that he could have refuted them, if at all, without knowing the identity of the staff members whose names were not revealed by the Board.

### (d) *The Right to an Impartial Tribunal*

Plaintiff claims that his hearing did not satisfy the requirements of due process because the School Board was not an impartial tribunal, citing these grounds: First, the members of the Board had prejudged plaintiff's case, having determined to fire him before hearing the case. Second, the Board had actual bias against plaintiff as a result of prior dealings with him. Finally, plaintiff claims that the Board unconstitutionally exercised the dual functions of adversary and adjudicator.

The plaintiff's claim of prejudgment is not substantial. The City Charter, § 58(b), gives the Board "the power to appoint and remove at pleasure following a hearing *if requested*" a Superintendent. From this language, it is clear that the Charter contemplates a prejudgment by the Board. There would be no reason for a Superintendent to request a hearing unless he had already been told that the Board intended to terminate his service. The situation here is similar to that in *Swab v. Cedar Rapids Community School District,* 494 F.2d 353, 354 (8th Cir. 1974), where the court refused to find prejudgment fatal when the state statute involved contemplated a preliminary decision by the school board to fire a teacher before the hearing occurred.

It is clear from the depositions of the defendants that they had determined prior to the hearings that plaintiff's services should be terminated, but is also clear that they came to the proceeding prepared to

hear evidence adduced by plaintiff which might change their decision.

Plaintiff also claims actual bias on the part of the Board members. It is clear, first of all, that there was no bias in the sense of adverse interest. The Board members did not have the sort of adverse interest in plaintiff's case which is condemned in *Gibson v. Berryhill*, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), and *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). They had no personal financial stake in plaintiff's case. The alternate basis for the actual bias claim, that the Board members possessed a personal *animus* against plaintiff, is not supported by the evidence. The transcripts of the hearings and the evaluation proceedings reveal many instances of expressions by Board members of support for plaintiff and appreciation for some of his achievements in the city schools. Absent specific evidence of this *animus,* it will not be inferred:

> Without a showing to the contrary, state administrators "are assumed to be men of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its circumstances." *United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 85 L.Ed. 1429 (1941).

. . .

*Shaw v. Board of Trustees of Frederick Community College,* 396 F.Supp. 872, 888 (D.Md.1975).

Plaintiff also claims that the Board should have disqualified itself since much of the evidence related to incidents in which Board members took part. This claim must fail. The entire structure of the Baltimore City School System contemplates a close working relationship between the Superintendent and the members of the School Board. The Charter vests in them the sole power to remove the Superintendent. They cannot be disqualified merely because they have had close contact with him throughout his term. *See Simard v. Bd. of Educ. of Town of Groton,* 473 F.2d 988, 993 (2d Cir. 1973), for a similar argument to the effect that prior dealings between a school board and a teacher cannot disqualify the board

as the tribunal to adjudicate that teacher's firing. In a related argument plaintiff objects to the Board members' giving evidence in a matter they would ultimately be required to judge. Once again the argument ignores the Charter and the structure of the system. The only standard for dismissal set out in the Charter is the "pleasure" of the Board. Surely the Board members are ones most able to address the question of whether they are "pleased" with plaintiff's performance. Regardless of whether the Board members' statements are regarded as evidence or as simply explanations of their reasons, the fact that they spoke cannot disqualify them.

Plaintiff's third and final argument relevant to impartiality is that the Board assumed a variety of inconsistent functions in the hearing of his case, by acting as judge, counsel and witness. The Board members' role as judges is mandated by the Charter. Similarly, their role as witnesses (as indicated above) is appropriate given the standard to be applied to plaintiff's performance. The real thrust of plaintiff's argument is that the Board performed an adversary function in the cross-examination of his witnesses. The Court has considered the transcript carefully and does not view the defendants' questionings as adversarial. It was their duty at the hearing to determine as many of the facts as possible in order to make their decision, and the examination of plaintiff's witnesses was an aid in that endeavor. The hearings were an informal administrative action; the separation of functions required elsewhere is not always a requisite in such proceedings. *Withrow v. Larkin,* 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975).

Cutting across and traversing all plaintiff's arguments against impartiality is the rule of necessity. When the only tribunal that has the authority to decide a particular dispute is in some way tainted, the rule of necessity requires that that tribunal hear the dispute anyway. *See* K. Davis, *Administrative Law Treatise* § 12.04 and Cumulative Supplement § 12.04. There is no dearth of case law applying the rule of

necessity to cases of public employee discharges. *Duffield v. Charleston Area Medical Center Inc.,* 503 F.2d 512, 519 (dictum) (4th Cir. 1974); *Simard v. Board of Education of Town of Groton,* 473 F.2d 988 (2d Cir. 1973); *Shaw v. Board of Trustees of Frederick Community College,* 396 F.Supp. 872, 887 (D.Md.1975). In this case the rule has particularly great force. The School Board was the only agency given the authority to hire and fire the plaintiff and the only agency given authority to preside at his hearing. Furthermore, their "pleasure" was the only standard by which his performance was to be judged; clearly no other tribunal could have sufficed.

It has been argued that the harsh rule of necessity should not apply when it results in a clear deprivation of constitutional rights. *Davis, supra* at § 12.04 n. 17 and accompanying text. However the only interest which plaintiff can plausibly show is a liberty interest. The hearing required before such an interest is deprived is one at which the employee is given a chance to clear his name. Plaintiff has not shown that any partiality on the part of the School Board has deprived him of that opportunity.

#### (e) *A Conclusion on Due Process*

Each of the so-called elements or ingredients of due process has been examined and as indicated herein in each case plaintiff was afforded his due. However, due process is not among those legal concepts that are readily reduced to a list of elements— as, for example, is the tort of battery. These elements are neither necessary nor sufficient conditions for due process; they are merely aids in arriving at the ultimate determination of whether the particular individual affected by state action was treated *fairly*. This ultimate determination of fairness may require looking at the entire process as a whole rather than dissecting it into parts or elements. Viewing the process as a whole, it is even more clear that the fundamental requirement has been met. Plaintiff was treated fairly. No process, of course, is perfect, and errors can be found in the most carefully conducted full-dress

courtroom proceedings. However, in light of the interests which plaintiff had to protect, the procedural safeguards that were afforded him and the public interest in securing an expeditious and just resolution of his case, it is apparent that plaintiff received all the process, and more, that was due him.

## V  FREE SPEECH

In Count IV of his Complaint, plaintiff alleges that the members of the Board of School Commissioners voted not to renew his contract in retaliation for certain speech of his that was protected by the First Amendment. His firing, he urges, deprived him of his First Amendment rights. At trial, plaintiff referred principally to a speech he gave at Dunbar High School concerning schools for disruptive children, a newsletter circulated to the staff on June 16, 1975, a speech he gave at a local church regarding "elitism" in the schools, and remarks relevant to the problem of middle schools.

A review of the testimony adduced at trial and the statements of the Board members made at the hearings indicates the following incidents which may be considered relevant to plaintiff's free speech claims:

1. *Commissioner Schaefer:* In his statement of reasons given at the hearings (plaintiff's exhibit 104, Vol. II p. 82), Commissioner Schaefer indicated that he had a philosophical difference with plaintiff. Plaintiff's educational philosophy, he said, put too much emphasis on the elimination of elitism in the schools.

2. *Commissioner Scott:* Plaintiff's exhibit 104, Vol. II pp. 237–244
   (a) In support of the statement that plaintiff "lacks good judgment," Commissioner Scott cited the newsletter of June 16, 1975, (as berating the City Fathers as racist) and a radio interview of June 9, 1975, (as inciting the citizens to arms).
   (b) In support of the statement that plaintiff lacks credibility, Scott cited

the Dunbar High School speech on disruptive schools. (He claimed that plaintiff failed to make any comment at the private session of the Board considering the disruptive school question and later "went public" with his opposition.

(c) In further support of the credibility charge, Scott pointed out plaintiff's early speeches against elite schools but noted that plaintiff sends his own child to Baltimore Polytechnic Institute (one of the elite schools plaintiff had criticized).

(d) At trial, Scott indicated that he had a basic philosophical dispute with plaintiff. He concluded from reports of several of plaintiff's speeches, that plaintiff was mistaken in telling the black youth of the City that their failures were entirely the fault of society's (Baltimore City School System's) shortchanging them, and that plaintiff's instructing black youth in this manner was counter-productive and likely to lead to lack of motivation on their part.

3. *Commissioner Marshall:* In his pretrial deposition (plaintiff's exhibit 54 p. 8) Mr. Marshall gave plaintiff's bad judgment as exhibited by the newsletter of June 16, 1975, as a reason for his decision to fire plaintiff.

4. *Commissioner Sachs:* In her statement at the hearings, Mrs. Sachs gave as an example of plaintiff's poor working relationship with the Board, his failure to supply correct information regarding the cost-effectiveness of converting elementary schools to secondary (middle) school use. (Plaintiff's exhibit 104, Vol. III pp. 10–15, 20–24, 57–62).

5. *Commissioner McCrea:* In his statement at the hearings, Mr. McCrea gave plaintiff's newsletter of June 16, 1975, as an example of bad judgment. (Plaintiff's exhibit 104, Vol. III pp. 150–151.)

Even if the employee has no property interest in his job, and can be fired for any reason or no reason, he cannot be fired for a constitutionally impermissible reason, *i. e.,* he cannot be fired in retaliation for his exercise of his First Amendment rights to free speech. This is the basic principle of the law relating the First Amendment to discharge from government jobs. *Perry v. Sindermann,* 408 U.S. 593, 598, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570, 578 (1972); *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Shumate v. Board of Education of the County of Jackson,* 478 F.2d 233 (4th Cir. 1973); *Chitwood v. Feaster,* 468 F.2d 359 (4th Cir. 1972). Therefore, a factual determination must be made to decide if the discharge of plaintiff occurred in retaliation for, or as punishment of, his exercise of protected speech.

The courts have provided helpful guidelines with regard to what is and is not protected speech. *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), is the central case considering the free speech rights of public employees in the field of education. *Pickering* first articulates the general principle stated above, but goes on to indicate that the State has important interest in regulating the speech of its employees which must be balanced against the employee's rights to free speech:

"[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." *Keyishian v. Board of Regents, supra* 385 U.S. 589 at 605–606 [87 S.Ct. 675, 17 L.Ed.2d 629]. At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering, supra* at 568, 88 S.Ct. at 1735, 20 L.Ed.2d at 817. That case involved the firing of a teacher for making critical comments about the administration's allocation of funds to school athletic activities. The Court held that the teacher's statements were protected, but it also gave certain guidelines for conducting the balancing analysis that it mandated:

> An examination of the statements in appellant's letter objected to by the Board reveals that they, like the letter as a whole, consist essentially of criticism of the Board's allocation of school funds between educational and athletic programs, and of both the Board's and the superintendent's methods of informing, or preventing the informing of, the district's taxpayers of the real reasons why additional tax revenues were being sought for the schools. The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning. Accordingly, to the extent that the Board's position here can be taken to suggest that even comments on matters of public concern that are substantially correct, such as statements (1)–(4) of appellant's letter, see Appendix, *infra,* may furnish grounds for dismissal if they are sufficiently critical in tone, we unequivocally reject it.[3]

*Pickering, supra* at 569–70, 88 S.Ct. at 1735, 20 L.Ed.2d at 818. Footnote 3 indicates that for higher level officials the scales might balance differently:

> 3. It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground

for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined. We intimate no views as to how we would resolve any specific instances of such situations, but merely note that significantly different considerations would be involved in such cases.

Other cases indicate that there are limits which may be placed on the speech of educators. In *Chitwood v. Feaster,* 468 F.2d 359, 360 (4th Cir. 1972), the court indicated that certain types of speech were clearly non-protected:

> Some of the affidavits refer to what seems to be bickering and running disputes with department heads. We do not intend to suggest that that kind of speech is protected by the First Amendment in the sense that it may not be considered in connection with termination of the employment relationship. A college has a right to expect a teacher to follow instructions and to work cooperatively and harmoniously with the head of the department.

*See also Shaw v. Board of Trustees of Frederick Community College,* 396 F.Supp. 872, 886 (D.Md.1975).

A synthesis of the case law indicates that the following types of statements may be unprotected as a result of the interest balancing required by *Pickering* :

(1) Statements which undermine discipline or harmony among co-workers.

(2) Statements which violate a requirement of confidentiality.

(3) Statements which impede the employee's proper performance of his duties.

(4) Statements which jeopardize a close working relationship between the employee and his supervisor which calls for personal loyalty and confidence.

(5) Defamatory remarks made with knowledge of falsity or reckless dis-

regard for truth (or possibly merely negligence).

Several of the Commissioners (Scott, Marshall and McCrae) indicated that a reason for the vote to fail to rehire plaintiff was his newsletter of June 16, 1975 (plaintiff's exhibit 87). This newsletter is essentially a letter of thanks to the staff in the school system. In relevant part it provides:

. . . This community is fortunate to have been able to maintain a staff of such rich quality *in spite of the heavy political control exercised by City Hall* and the low salaries paid in comparison with surrounding counties.

*In spite of the existing repressive atmosphere prevailing throughout the city,* it is certain that you will continue to move rapidly towards the kind of quality in education most beneficial to all of the students of this city. [Emphasis supplied.]

One of the Board members who cited this newsletter indicated that by implication it was a charge of racism against the City Fathers. Commissioner Scott testified that just as whites' references to "law and order" are clearly understood to refer to black crimes, so blacks' references to "repressive atmospheres" (Scott is black) are clearly understood to be charges of racism. Regardless of how the statement is characterized, all the Board members who cited it testified at trial or at the hearings that it exhibited very poor judgment, containing as it did a criticism of the very city administration which the Education Department would soon have to approach for funds for the coming year's program. The uniform citation of this newsletter as an example of poor judgment indicates that the Commissioners did not intend to retaliate against plaintiff for the statement or punish him for it. Rather, it indicates that the Commissioners considered the poor judgment exhibited in the newsletter caused plaintiff to be an ineffective Superintendent.

Measured against the *Pickering* criteria set out above, the newsletter is clearly not protected speech. It impedes plaintiff's proper performance of his job (criteria # 4)

since part of his job is the maintenance of civil relations with "City Hall," so that his department's funding will not be impaired. Likewise, it undermines discipline (criteria # 1) and jeopardizes the close working relationship between plaintiff and "City Hall" and between plaintiff and the Board. The Board and the City administration could not be expected to maintain daily working contact with plaintiff after he has charged them with "exercising heavy political control" and fostering a "repressive atmosphere."

Commissioner Scott indicated that a radio interview of plaintiff on June 9, 1975 (the day the Board voted to terminate him) indicated poor judgment. Plaintiff testified that he said merely that the City will not tolerate the Board's action. Scott interpreted this statement to be an incitement of the people to riot. Once again, the interpretation is not crucial, since such speech clearly undermined discipline and jeopardized plaintiff's already tense working relationship with his superiors.

In support of the statement that plaintiff lacked credibility (one of the Specifications), Commissioner Scott indicated at the hearings that plaintiff had sat through a Board meeting at which a policy favoring schools for disruptive children was adopted. Although he did not object at the meeting, plaintiff later gave a speech at Dunbar High School which was critical of the program. Scott indicated that this behavior made plaintiff less believable to him and other members of the Board. Scott's motive, then, was not a retaliation for plaintiff's speech, but a lack of confidence resulting from private acquiescence and public criticism. On the *Pickering* criteria such speech is not protected; it severely jeopardized the working relationship since that relationship required that the Board have confidence in plaintiff's advice and his loyalty.

Commissioner Sachs indicated that one of her reasons for voting to discontinue plaintiff was a report by him to the Board on the cost effectiveness of converting elementary schools into secondary or middle schools.

The report indicated that the conversion would be so costly as to cripple the capital improvement system. Mrs. Sachs indicated that when she sought independent confirmation from appropriate state officials of this assessment she was informed that the conversions would not cripple the program. Mrs. Sachs also referred to a report prepared some ten months earlier by plaintiff's staff which indicated that the middle school program was in fact cost effective, and which was dismissed by plaintiff at a School Board meeting as obsolete. She indicated that these episodes caused her to lose confidence in plaintiff's ability to supply the Board with correct information. Her vote was not therefore a retaliation against his exercise of his First Amendment rights; and based on the *Pickering* criteria, the statements are not protected.

Finally, several members of the Board relied on what they candidly admitted to be differences with plaintiff on matters of educational philosophy. Commissioners Schaefer and Scott indicated that they had long standing differences with plaintiff regarding "elite" schools for exceptional children. Plaintiff, as early as 1971 had made speeches opposing such schools. Scott and Schaefer indicated that they thought plaintiff put too much emphasis on eliminating elitism to the point of lowering academic and deportment standards overall. Commissioner Scott also indicated a fundamental disagreement with plaintiff's views as to the causes of failures among black students in the schools.

Philosophical differences between the Board and plaintiff are regrettable, but the interest of the Board must be paramount. It is charged with conducting the system of public education. It engages a Superintendent, removable at pleasure, to carry out its policies. Surely one of the criteria in hiring a Superintendent would have to be his views on education. Just as surely, long-standing disputes on educational philosophy between Board members and the Superintendent are a permissible ground for discharge. The Commissioners are entitled to have confidence that the Superintendent will carry out their policies willingly and not grudgingly. Persistent doctrinal differences regarding educational principles rob the Board of this confidence. On this view, plaintiff's remarks during his employment on these subjects are unprotected under *Pickering*. They jeopardize his confidential relationship with the Board and impede his job performance.

In conclusion, the plaintiff's First Amendment claims are not meritorious. The facts do not indicate a Board attempt to punish or retaliate against plaintiff. Rather, the picture is one of a persistent course of conduct (some speech, some not) which caused the Board to lose confidence in plaintiff, thus impeding the performance of his job and damaging the close working relationship between plaintiff and the Board. On these facts, *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and their progeny, indicate plaintiff was not terminated in violation of his First Amendment rights.

## VI  QUALIFIED IMMUNITY

In light of the conclusions on the statutory and constitutional issues in this case, it is not necessary to reach the question of whether or not the individual defendants are insulated from damage recovery by the defense of qualified immunity. Nevertheless, having heard evidence on this question, it is in the interests of judicial economy to make a finding.

In *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), the Supreme Court held that traditional tort law immunities were available as defenses to suits under section 1983. Several recent cases have held that state officials have a qualified immunity for acts done within the scope of their discretionary duties. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Bursey v. Weatherford*, 528 F.2d 483 (4th Cir. 1975); *Schoonfield v. Mayor and City Council of Baltimore*, 399 F.Supp. 1068 (D.Md.1975); *Bennett v. Gravelle*, 323 F.Supp. 203 (D.Md.), *aff'd*, 451

F.2d 1011 (4th Cir. 1971), *cert. dismissed,* 407 U.S. 917, 92 S.Ct. 2451, 32 L.Ed.2d 692 (1972). There was some question however, as to the scope of the qualified immunity. Recently in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Supreme Court carefully defined that scope:

> Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student.

*Wood, supra* at p. 322, 95 S.Ct. at p. 1001, 43 L.Ed.2d at p. 225. This test is equally applicable in the case of employee discharges.

From the evidence presented, the defendants have affirmatively shown good faith within the *Wood* definition. Each defendant indicated that he had no malicious intent to cause harm to the plaintiff. Not atypical of their attitude was the statement of defendant Marshall at the hearings (Vol. II pp. 297–304) that he had no intent or desire to defame plaintiff but would give his reasons for his vote if the reasons were desired. Plaintiff's attorney refused to indicate whether he wanted the reasons or not. Mr. Marshall was somewhat confused by plaintiff's insistence on more specific notice and his attorney's refusal to indicate whether Marshall's reasons were desired; finally he gave his reasons.

Each defendant testified that the statements made at the hearing were not false and certainly not known to be false or made with reckless disregard of truth or falsity. The plaintiff's cross-examination failed to prove otherwise. Plaintiff attempted to show that certain statements by witnesses were known to be false by members of the Board. A review of the transcript indicates that the statements plaintiff attributes to the witnesses (particularly White and Ben-

ton) were not, in fact, the statements they made. The statements actually made were not known to be false by Board members nor were the Board members reckless regarding the truth of these statements.

The *Wood* test withdraws immunity from an official if he knew or should have known that his actions violated the constitutional rights of another. Each defendant testified that the Board sought and received legal advice of the City Solicitor's Office regarding the question of notice and the question of termination of the hearings. The Board members, even if wrong, cannot be held to have acted negligently regarding plaintiff's rights.

## VII

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, this Memorandum Opinion and Order shall constitute the findings of fact and conclusions of law in the above captioned case, whether or not so specifically designated.

Accordingly, for the reasons set forth herein, it is this 29th day of March, 1976, by the United States District Court for the District of Maryland, ORDERED:

That judgment be, and the same is, hereby entered in favor of the defendants.